UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                            :

SHALVA PAVLOVICH CHIGIRINSKIY,     :
                                            :

                        Plaintiff,   :      14-CV-4410 (JPO)
                -v-               :
                                            :      <u>OPINION AND ORDER</u>

TATIANA ROMANOVA PANCHENKOVA,    :
                                            :
                    Defendant.  :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       Plaintiff, Shalva Pavlovich Chigirinskiy ("Shalva"), brings this action against his ex-wife,

Tatiana Romanova Panchenkova ("Tatiana"), seeking to recover money and property in

Tatiana's possession that is allegedly wholly or partly his.  Shalva asserts causes of action for

breach of contract, conversion, unjust enrichment, fraudulent inducement, accounting, and

constructive trust.  Tatiana moves to strike portions of the complaint and to dismiss all of

Shalva's claims.  For the reasons that follow, Tatiana's motion to strike is denied and her motion

to dismiss is granted in part and denied in part.

## I.  Background

### A.  Factual Background[1]

#### 1.  The Parties

Shalva and Tatiana met in Russia in the late 1990s.  (Dkt. No. 4 Ex. A, Complaint ("Compl."), ¶ 18.)  They married in December 2003 and have a total of four children together.  (*Id.*)  In 2008, Shalva and Tatiana decided to relocate their family to the United States.  (*Id.* ¶ 19.)  They began the process of moving to the United States in late 2008 or early 2009.  (*Id.* ¶ 23.)

In early 2009, Shalva and Tatiana "decided to formally end their marriage" but "continue to live together as *de facto* husband and wife with the children" in the United States.  (*Id.* ¶ 20.)  They obtained a divorce decree in Russia in April 2009.  (*Id.*)

Shalva and Tatiana initially settled in New York City.  (*Id.* ¶ 24.)  "[O]n and off from approximately February to September 2009," they resided at an apartment in Manhattan at 44 East 67th Street (the "East 67th Street Apartment").  (*Id.*)  They subsequently moved to a home in Greenwich, Connecticut.  (*Id.*)  Beginning in April 2010, however, Shalva "became increasingly concerned about information he received about secret financial dealings by [Tatiana]."  (*Id.* ¶ 26.)  In August 2010, he decided that "trust in the relationship had irretrievably broken down" and ceased cohabitation with Tatiana.  (*Id.*)  Tatiana remarried in 2011.  (*Id.* ¶ 27.)

---

[1] The facts below are, unless otherwise noted, drawn from the Complaint, and are accepted as true on a motion to dismiss brought under Federal Rule 12(b)(6).  *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.,* 737 F.3d 166, 176 (2d Cir. 2013).

### 2.   The Collection

Both before and during his marriage to Tatiana, Shalva amassed a "significant and valuable" collection of household items (the "Collection").  (*Id.* ¶ 28.)  Prior to the marriage, the Collection comprised "unique artwork, valuable decorative objets d'art (including numerous precious items made by the famous House of Faberge) and antiques as well as antique, historic and first edition books, primarily Russian in origin."  (*Id.*)  Shalva and Tatiana added more valuable property to the Collection during their marriage, including "extensive and expensive household fixtures and decorative items including antique furniture, oriental carpets, chandelier and valuable sconces, decorative vases and other similar furnishing[s]."  (*Id.*)  Shalva alleges that the value of the Collection "was at relevant times in the range of $120 million."  (*Id.*)

Before the parties divorced, Shalva transferred title to a portion of the Collection to Tatiana via three deeds of gift.  (*Id.* ¶ 29; Dkt. No. 38, Declaration of Maria Grechishkina ("Grechishkina Decl."), Ex. 1, Declaration of Larisa Nukhimovna Ryabchenko ("Ryabchenko Decl."), Ex. U ("Deeds").)  Shalva alleges that he executed the Deeds—signed on October 4, 2007, March 25, 2008, and September 2, 2008—on Tatiana's "explicit and repeated representations that [the Collection] would be preserved by her in trust for her, her son from a former marriage, and [Shalva and Tatiana's] four children in specific shares."  (Compl. ¶¶ 14, 29.)  Shalva pleads that "[t]hese representations were made by [Tatiana] for the purpose of inducing [Shalva] to transfer the valuable property to her."  (*Id.* ¶ 14.)

Shalva and Tatiana allegedly struck an "agreement" that the "major part" of the Collection, including the property gifted to Tatiana, would be shipped to the United States.  (*Id.* ¶ 22.)  Tatiana supervised the shipment of some, but not all, of this property to New York from the parties' homes in France, England, and Russia.  (*Id.* ¶ 23.)  Tatiana had some of the property

shipped to the East 67th Street Apartment, and some to an art storage facility in Manhattan.  (*Id.*)
She later transferred some of the property to Connecticut.  (*Id.*)  It appears that some property
was also sent to secure storage facilities in Europe.  (*Id.* ¶ 32.)  Shalva alleges that because
"[Tatiana] and her staff handled all of the details of the shipping" (*id.* ¶ 23), she is likely to have
a complete inventory and photographs of all of the items in the Collection (*id.* ¶ 32).  In contrast,
Shalva, who was not involved in the shipping of the Collection and does not recall its full range
of items, alleges that he does not have the complete list of items shipped to the United States or
sent to storage in Europe.  (*Id.*)

After the parties' relationship ended in 2010, Tatiana allegedly began selling items from
the Collection for her own benefit.  (*Id.* ¶ 33.)  Some of the items, Shalva alleges, were sold at
"substantially below market value," evincing Tatiana's intent "to dissipate the Collection and not
[] preserve it or its value."  (*Id.*)

### 3.  The Real Estate

Shalva alleges that, when the parties divorced, Tatiana owned, either directly or indirectly
through "alter-ego corporate entities," five apartments in New York City.  (*Id.* ¶¶ 34, 37.)
Among these was the East 67th Street Apartment, where the parties resided when they first
arrived in New York.  Tatiana allegedly owned this apartment while the family lived there, but
falsely represented to Shalva that she rented it.  (*Id.* ¶¶ 24, 34.)  Based on this representation,
Shalva transferred Tatiana approximately $6,000 per month—funds that Tatiana "converted . . .
to her own use."  (*Id.* ¶ 24.)

Tatiana allegedly failed to disclose the five New York apartments at the time of the
parties' divorce.  (*Id.* ¶ 35.)  Shalva learned about four of these apartments—which Tatiana refers

to as the "Old Apartments"[2]—in 2012, and filed suit in Russia seeking division or compensation for them.  (*Id.* ¶ 36.)  Shalva claims that his suit was dismissed "on a preliminary procedural issue regarding formalities for presenting foreign records," and was never adjudicated on the merits.  (*Id.*)  The fifth apartment, which Shalva learned about in 2014, has not been the subject of suit in Russia.  (*Id.* ¶ 37.)

Three other real estate properties are in dispute.  Two are penthouse apartments that Tatiana purchased through alter-ego entities in 2010, before the parties separated, in a building at 205 East 85th Street.  (*Id.* ¶ 38.)  Tatiana allegedly purchased those properties with marital funds but has since sold them.  (*Id.*)  The third is a joint investment that Shalva and Tatiana made in an apartment in April 2008 in the Mark Hotel in New York City.  (*Id.* ¶ 39.)  There has been a delay in the development of this property, and it is unclear whether it will be proceed or whether the funds will be returned to investors.  (*Id.*)  Shalva contends, nonetheless, that he is entitled to whatever value is realized in connection with this apartment.  (*Id.*)

### 4.  Jewelry

Also in dispute are three pieces of jewelry (the "Jewelry") in Tatiana's possession: a 37-carat diamond ring that Shalva purchased in London in October 2006, for approximately $3.6 million, and an emerald ring and ruby necklace that Shalva bought in January 2008 in Switzerland for $1.9 million.  (*Id.* ¶ 40.)  Shalva contends that these items were bought as "investments" that Tatiana "was permitted to use . . . for only so long as she and [Shalva] were together as a couple."  (*Id.*)  Title to the Jewelry remains with Shalva.  (*Id.*)

---

[2] The Old Apartments consist of the East 67th Street Apartment, two apartments at 150 West 56th Street, and one apartment at 175 East Broadway.  (Compl. ¶ 34.)

### B. Procedural History

#### 1. Prior Litigation

There are two legal disputes between these parties of potential relevance to this action.

First, in connection with the parties' divorce in April 2009, Tatiana began a proceeding in Russia

to divide ownership of some of the couple's marital property.  (Dkt. No. 45, Plaintiff's

Opposition to Defendant's Motion to Dismiss ("Opp. Memo"), at 4.)  That proceeding resulted in

a judgment that divided some, but not all, of the parties' marital property.  (Ryabchenko Decl.

Ex. L ("2009 Judgment").)  Second, as alluded to above, Shalva commenced an action in Russia

in 2013 to dispute the ownership of certain property—including the "Old Apartments"—but that

action was dismissed because relevant documents were not "apostilled."[3]  (Opp. Memo at 20;

Compl. ¶ 36; Ryabchenko Decl. Ex. P ("2013 Judgment").)  The relevance of these proceedings

is discussed in greater detail below.[4]

Shalva alleges that on May 6, 2014, his counsel sent a letter to Tatiana's counsel

demanding return of property from the Collection and other marital property.  (Compl. ¶ 41.)

Tatiana's counsel allegedly acknowledged receipt of the letter but did not respond to it.  (*Id.*)

This suit followed.

#### 2. This Action

Shalva commenced this action in the Supreme Court of the State of New York on June 5,

2014.  Tatiana filed a notice of removal on June 18, 2014.  (Dkt. No. 1.)  Shalva then moved to

---

[3] Shalva refers to an "apostille" as "a form of international certification equivalent to notarization."  (Opp. Memo at 24.)

[4] Tatiana has also initiated litigation against Shalva in Connecticut state court in connection with allegations of domestic abuse by Shalva, the custody of their children, and enforcement of the 2009 Judgment.  (Def. Memo at 5–6.)

remand for want of federal jurisdiction.  (Dkt. No. 2.)  The Court denied the motion, finding

jurisdiction proper because Tatiana had demonstrated United States citizenship.  (Dkt. No. 19.)

Tatiana moved to strike portions of the Complaint on July 14, 2014.  (Dkt. No. 17.)

Shalva filed an opposition to the motion, and Tatiana filed a reply.  (Dkt. Nos. 26 & 29.)  The

motion to dismiss was filed on August 15, 2014.  (Dkt. No. 36.)  Shalva filed his opposition to

that motion on October 2, 2014, and Tatiana filed a reply on October 25.  (Dkt. Nos. 45 & 55.)

## II.   Discussion

Shalva asserts six claims against Tatiana in this action.  All are under state law, and all

are connected to Tatiana's allegedly wrongful appropriation—and in some cases, sale—of

property that Shalva claims belongs, in whole or in part, to him.

First, Shalva sues for breach of contract.  He alleges that he and Tatiana had an

agreement both that property purchased during the marriage would remain their joint property

and that property purchased by Shalva prior to their marriage would continue to be owned by

Shalva.  (Compl. ¶ 44.)  This property would be "enjoyed by them jointly and for the benefit of

their family while they cohabitated with their children in the United States."  (*Id.*)  Tatiana

allegedly violated this agreement by both failing to return the property and selling some of the

property and not paying Shalva for its value.  (*Id.* ¶ 46.)  Second, Shalva sues for conversion,

alleging that Tatiana "holds or held and sold both tangible and real property to which [Shalva] is

rightfully entitled as marital property, property owned before marriage, or property pursuant to

an oral contract."  (*Id.* ¶ 49.)  Third, Shalva sues for unjust enrichment, both for property to

which she was not entitled and proceeds from sale of property that she was required to maintain.

(*Id.* ¶¶ 55–56.)  Fourth, Shalva sues for rescission of the Deeds on the basis of Tatiana's

"fraudulent misrepresentation" that she would transfer the property "into an appropriate

structure" in trust for herself, her son from a previous marriage, and the parties' four children. (*Id.* ¶¶ 58–61.) Fifth, Shalva seeks an accounting of the property Tatiana currently holds and has sold from 2008 to the present. (*Id.* ¶¶ 62–65.) Sixth and finally, Shalva seeks a constructive trust over the money and property in Tatiana's possession to which he is entitled. (*Id.* ¶¶ 66–68.)

Tatiana argues that the action merits dismissal on five grounds: (1) that this court is not the most appropriate and convenient forum for this case; (2) that the court should abstain on the basis of international comity; (3) that Shalva's claims are barred by *res judicata*; (4) that the statute of limitations has run on all of Shalva's claims; and (5) that Shalva fails to state a claim upon which relief can be granted.

### A.  Subject Matter Jurisdiction

This Court previously concluded that this action meets the requirements for federal diversity jurisdiction under 28 U.S.C. § 1332(a)(2). (*See* Dkt. No. 19.) The Court is also satisfied that this case does not fall within the narrow "domestic relations" exception to diversity jurisdiction, which is limited to cases "involving the issuance of a divorce, alimony, or child custody decree." *See Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992). Nor is this matter "on the verge" of the domestic relations exception, to the extent that the Second Circuit's decision in *Bossom v. Bossom* remains good law. 551 F.2d 474, 475 (2d Cir. 1976); *see Fromer v. Mincheff*, No. 13-CV-8567 (JPO), 2014 WL 3537014, at *1 n.2 (S.D.N.Y. July 17, 2014) ("It is not precisely clear how much of *Bossom* survived . . . [the] overall tightening of judicially crafted exceptions to 28 U.S.C. § 1332 [in *Marshall v. Marshall*, 547 U.S. 293 (2006)]." (citing Wright, Miller & Cooper, 13 Federal Practice and Procedure § 3609.1 (3d ed. 2014)).

### B. Choice of Law

The parties disagree on what law governs Shalva's claims. Tatiana contends that Russian law governs "significant issues" in the case, while Shalva argues that New York or Connecticut law applies to all the claims except his cause of action for fraudulent inducement, which he concedes is governed by Russian law. (Opp. Memo at 9.)

"A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under New York law, the first step in the choice-of-law analysis is to determine whether there is, in fact, an "actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). Only if there is such a conflict is the court required to apply choice-of-law principles and resolve which forum's law applies. *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

Neither party has meaningfully addressed whether there is an actual conflict between the law of Russia and that of New York and Connecticut on the causes of action pleaded here.[5] District courts "need not . . . avoid[] a full analysis" of a foreign forum's law "on the basis of an inadequate submission by one party," and should exercise their power under Federal Rule 44.1 to ascertain that law by considering "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Curley*, 153

---

[5] Shalva faults Tatiana for "mak[ing] no showing that even Russian law is materially different from the law of the forum on the fundamental claims here at issue" (Opp. Memo at 7), but "conventional notions of burden of proof . . . are anathema to the underlying purpose of Rule 44.1," and the parties have "a collective responsibility" to assist the Court in ascertaining foreign law. *In re Ishihara Chem. Co., Ltd.*, 121 F. Supp. 2d 209, 217 (E.D.N.Y. 2000), *vacated on other grounds*, 251 F.3d 120 (2d Cir. 2001).

F.3d at 13 (quoting Fed. R. Civ. P. 44.1).  In this case, however, the Court need not resolve whether there is a conflict of laws because, even if there were, New York or Connecticut law would apply to everything except the fraudulent inducement claim.

"New York applies separate choice-of-law approaches to contract and to tort claims." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir. 2005).  For contract claims, New York courts apply "the 'center of gravity' or 'grouping of contacts' choice of law theory."  *Id.* (quoting *In re Allstate Ins. Co.*, 613 N.E.2d 936, 939 (N.Y. 1993)) (brackets omitted).  As the Court of Appeals has noted, the most significant contacts in this analysis are "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties."  *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, No. 07-CV-6915 (DLC), 2008 WL 5233691, at *2 (S.D.N.Y. Dec. 16, 2008) (quoting *In re Allstate*, 613 N.E.2d at 940).

The "center of gravity" of the breach of contract claim here is either New York or Connecticut.  Each state is more closely connected to the claim than Russia is.  Shalva concedes that the alleged contract was formed in Russia before the parties moved to the United States (Opp. Memo at 7), so the first two relevant factors—the place of contracting and the place of negotiation—point to the application of Russian law.  But the balance of factors weigh in favor of New York or Connecticut.  The contract, under which the parties allegedly agreed to enjoy their joint and individual property while they cohabitated, was performed in New York and Connecticut.  The subject matter of the contract—the aforementioned property—is largely in

these states.[6]  And while Shalva's domicile is unclear—he insists that "he has not been domiciled [in Russia] for over five years" (*id.* at 11)—Tatiana is domiciled in Connecticut.  New York or Connecticut law therefore governs the breach of contract claim.

With respect to tort claims, New York applies an "interest analysis."  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985)) (internal quotation marks omitted).  For purposes of this analysis, torts are divided into two categories: "conduct-regulating" torts, which involve "the appropriate standards of conduct," and "loss-allocating torts," which have to do with "allocating losses that result from admittedly tortious conduct."  *Schultz*, 480 N.E.2d at 684–85.  The nature of the analysis depends on the type of tort at issue.  If the tort is conduct-regulating—as the alleged torts here are—"the law of the place of the tort will usually have a predominant, if not exclusive, concern."  *Id.* at 684 (internal quotation marks omitted).

Shalva's claims for conversion and unjust enrichment, which are torts subject to interest analysis, are likewise governed by New York or Connecticut law.  Conversion is plainly a conduct-regulating tort.  *See, e.g.*, *Charron v. Sallyport Global Holdings, Inc.*, No. 12-CV-6837 (WHP), 2014 WL 7336463, at *20 (S.D.N.Y. Dec. 24, 2014).  District courts in this circuit disagree about which choice-of-law test applies to unjust enrichment claims.  *See Gerloff v. Hostetter Schneider Realty*, No. 12-CV-9404 (LGS), 2014 WL 1099814, at *9 (S.D.N.Y. Mar. 20, 2014) ("Whether to apply to an unjust enrichment claim New York's 'center of gravity' choice of law test applicable to contract disputes, or New York's 'interest analysis' test

---

[6] As noted above, Shalva alleges that some of the property was shipped not to the United States, but to storage in Europe.  (Compl. ¶ 32.)

applicable to tort claims, is a matter of debate among district courts in this Circuit.").  As pleaded

here, the unjust enrichment claim here sounds more in tort than it does in contract, and the Court

therefore applies interest analysis.  *Cf. Fieger*, 251 F.3d at 394 (applying the "center of gravity"

to a quantum meruit claim "sound[ing] more in contract than in tort).  That analysis clearly

points to the application of the law of New York or Connecticut.  The conduct underlying both

the conversion and unjust enrichment causes of action—Tatiana's failure to return property in

which Shalva has an interest and proceeds from the sale of such property—occurred in the

United States, either in New York or Connecticut, and the Court sees no compelling reason not

to apply the law of those jurisdictions here.  The same is true for the constructive trust and

accounting causes of action, because they are connected to property located in New York or

Connecticut.  *See Moses v. Apple Hospitality Reit Inc.*, No. 14-CV-3131 (DLI) (SMG), 2015 WL

1014327, at *4 (E.D.N.Y. Mar. 9, 2015) ("With respect to constructive trusts, 'the law of the

situs of the property' governs such claims . . . ." (quoting *S.E.C. v. Credit Bancorp, Ltd.*, 138 F.

Supp. 2d 512, 531 (S.D.N.Y. 2001), *rev'd in part, vacated in part on other grounds*, 297 F.3d

127 (2d Cir. 2002))); *Stikas v. J.P. Morgan Chase Bank, Nat. Ass'n*, No. 14-CV-1277 (PAC),

2015 WL 1262203, at *6 (S.D.N.Y. Mar. 19, 2015) ("Since an accounting is equitable, the law of

the jurisdiction with the greater interest in having its law applied in the litigation governs.  Here,

Connecticut law has the greatest interest in the litigation because the property at issue is in

Connecticut, and Plaintiff suffered her alleged damages there." (internal quotation marks

omitted)).

　　　　At this stage, the Court need not decide whether New York or Connecticut law governs

the above claims because, as discussed below, all of them—with the exception of the causes of

action for an accounting and constructive trust—withstand the motion to dismiss regardless of which state's law applies.

As to the claim for rescission based on fraudulent inducement, Shalva properly concedes that Russian law applies. Each of the Deeds contains a choice-of-law clause stating that the Deed "may be terminated in accordance with the applicable laws of the Russian Federation." (*See* Deeds at 2, 13, and 19.) However, "under New York law, a contractual choice-of-law provision governs only a cause of action sounding in contract, not one sounding in tort, unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties." *Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13-CV-1654 (RA), 2014 WL 2610608, at *40 (S.D.N.Y. June 10, 2014) (quoting *H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n. 5 (S.D.N.Y. 2001)) (brackets and internal quotation marks omitted). Courts treat the specific wording of a choice-of-law provision as crucial in determining how broad the provision is: provisions applying to disputes "arising out of" or "relating to" a contract are capacious enough to reach related tort claims, while provisions stating that a contract will be "governed by" or "construed in accordance with" the law of a state are not. *Id.* (internal quotation marks omitted); *see also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (holding that a choice-of-law provision stating that the contract "shall be governed by and construed in accordance with the laws of . . . Massachusetts" was not "broad[] enough to apply to fraudulent misrepresentation"). Here, there is no ambiguity: the choice-of-law provision speaks to the directly to the remedy Shalva seeks—

termination of the Deeds—and provides that Russian law shall apply.[7]  The fraudulent

inducement claim is therefore governed by Russian law.

### C.  Forum Non Conveniens

#### 1.  Governing Principles

*Forum non conveniens* permits dismissal of an action when "a court abroad is the more

appropriate and convenient forum for adjudicating the controversy."  *Sinochem Intern. Co. v.*

*Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 425 (2007).  The doctrine is "essentially[] a

supervening venue provision, permitting displacement of the ordinary rules of venue when, in

light of certain conditions, the trial court thinks that jurisdiction ought to be declined."  *Id.* at

429–30 (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994)) (internal quotation

marks omitted).  The burden of proof "on all elements of the motion" to dismiss for *forum non*

*conveniens* falls on the defendant, *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State*

*Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001), and "[a]ny review of a *forum non*

*conveniens* motion starts with a strong presumption in favor of the plaintiff's choice of forum,"

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005) (quoting *Piper*

*Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)) (internal quotation marks omitted).

In *Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001) (en banc), the

Second Circuit outlined a three-step analysis for motions to dismiss for *forum non conveniens*.

---

[7] Even if the choice-of-law provision were not determinative here, Russian law would still apply because the alleged fraudulent inducement occurred in Russia.  (Compl. ¶ 29; Opp. Memo at 9.)  *See H.S.W. Enters.*, 171 F. Supp. 2d at 142 ("In cases involving conduct-regulating laws, like fraudulent inducement, where the parties are domiciled in different states, the locus of the tort will almost always be determinative." (quoting *Krock*, 97 F.3d at 646) (brackets and internal quotation marks omitted)).

The "first level of inquiry" in the analysis is an assessment of the level of deference owed to a plaintiff's choice of forum. *Iragorri*, 274 F.3d at 73. The degree of deference to which that choice is entitled "varies with the circumstances": "great deference" is owed where the plaintiff is suing in her home forum, while "less deference" attaches when foreign plaintiff selects a United States forum for her suit. *Id.* at 71 (citing *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 30 U.S. 518, 524 (1947); *Piper Aircraft*, 454 U.S. at 255–56). This is so because a plaintiff's residence is generally a proxy for convenience: a plaintiff's choice of her home forum "is presumed to be convenient," while it is "much less reasonable" to presume that a foreign plaintiff has selected a U.S. forum for reasons of convenience. *Id.* (internal quotation marks omitted).

A plaintiff's residence is not dispositive of the level of deference owed, however. The Second Circuit has instructed that district courts are to assess deference on a "sliding scale" approach:

> The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for forum non conveniens.

*Id.* at 71–72 (footnote omitted). In making this assessment, courts are required to weigh factors tending to show that a choice of forum was genuinely motivated by considerations of convenience and factors indicating that a choice was made for forum-shopping reasons. *Norex Petroleum*, 416 F.3d at 156. The "convenience factors," which weigh against dismissal, include "[1] the convenience of the plaintiff's residence in relation to the chosen forum, [2] the availability of witnesses or evidence to the forum district, [3] the defendant's amenability to suit

15

in the forum district, [4] the availability of appropriate legal assistance, and [5] other reasons relating to convenience or expense." *Id.* at 155 (internal quotation marks omitted). The "forum-shopping factors" that militate against deference to a plaintiff's choice of forum include "[1] attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, [2] the habitual generosity of juries in the United States or in the forum district, [3] the plaintiff's popularity or the defendant's unpopularity in the region, or [4] the inconvenience and expense to the defendant resulting from litigation in that forum." *Id.* (internal quotation marks omitted). The court is not required to consider each of the convenience and forum-shipping factors, but its analysis should be holistic and avoid emphasizing one factor to the exclusion of others. *Id.* The greater the deference owed to a plaintiff's choice of forum, the greater the defendant's burden to demonstrate the genuine inconvenience of the forum. *Iragorri*, 274 F.3d at 74.

The deference analysis is followed by two more steps. First, the district court "asks if there is an alternative forum that has jurisdiction to hear the case." *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir. 1996). "An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Bank of Credit & Commerce Int'l*, 273 F.3d at 246 (internal quotation marks omitted). Second, the district court determines, based on "the *Gilbert* factors," which forum would be the "most convenient" and "best serve the ends of justice." *Peregrine Myanmar*, 89 F.3d at 46 (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501 (1947)). In doing so, the court must weigh both "private interest" factors and "public interest" factors. *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29 (2d Cir. 2002). The "private interest" factors include "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view

16

of premises; and (5) all other factors that might make the trial quicker or less expensive." *Id.* at 29–30 (citing *Gilbert*, 330 U.S. at 508). The "public interest" factors to be considered are "(1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the local interest in having localized controversies decided at home; and (4) avoiding difficult problems in conflict of laws and the application of foreign law." *Id.* at 31 (citing *Gilbert*, 330 U.S. at 508–09) (internal quotation marks omitted).

Having considered all of the above, the district court should dismiss the action for *forum non conveniens* "only if the chosen forum is shown to be genuinely inconvenient and the [alternate] forum is significantly preferable." *Iragorri*, 274 F.3d at 74–75. The court must be mindful that forum-shopping considerations may motivate a defendant to press for dismissal as much as they drive a plaintiff to resist it. *Id.* at 75. The court should therefore "arm [itself] with an appropriate degree of skepticism" in determining whether the chosen forum is in fact genuinely inconvenient and the alternative forum is clearly preferable. *Id.*

### 2. Analysis

Applying that framework here, the Court finds that Tatiana has not met her burden of showing that the Southern District of New York is a genuinely inconvenient forum and that a Russian court would be significantly preferable.

### a. Deference to Shalva's Choice of Forum

At the first step, the Court concludes that some deference is owed to Shalva's choice to bring his action in this forum.[8]

---

[8] Neither of the parties has briefed the deference factors in any depth.

It is undisputed that, while Shalva has a residence in New York, he is not a citizen of the United States.  (Compl. ¶ 7; Dkt. No. 37, Defendant's Memorandum of Law in Support of its Motion to Dismiss ("Def. Memo"), at 10.)  But citizenship is not dispositive, and the same presumption of deference to a plaintiff's choice of forum applies where a noncitizen plaintiff is a U.S. resident.  *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 103 (2d Cir. 2000) ("We have never accorded less deference to a foreign plaintiff's choice of a United States forum where that plaintiff was a U.S. resident."); *see also Piper Aircraft*, 454 U.S. at 255 n.23 ("Citizens or residents deserve somewhat more deference than foreign plaintiffs . . . .").  Shalva, however, stops short of arguing that he is a U.S. resident.  He contends merely that he "has a home in New York and is frequently in residence here for extended periods."  (Opp. Memo at 11).  Tatiana's evidence, moreover, is that Shalva holds only a nonimmigrant visa.[9]  Accordingly, for the purposes of *forum non conveniens*, the Court's analysis proceeds on the basis that Shalva is neither a citizen nor resident of the United States.

Nonetheless, the suit here bears a bona fide connection to the chosen forum.  The "convenience" factors indicate that the choice of forum is likely to have been motivated by genuine convenience.  First, while Shalva is not strictly a U.S. resident, his place of residence in practical terms is convenient in relation to New York.  Shalva, along with Tatiana and his family, moved to New York several years ago.  He has a home in New York, and while he remains a citizen of Russia and has pursued litigation there against Tatiana, he does not appear to maintain

---

[9] (*See* Grechishkina Decl. Ex. 2, Declaration of Tatiana Panchenkova ("Tatiana Decl."), ¶¶ 30–31.)  In deciding a motion to dismiss for *forum non conveniens* without a factual hearing, a court accepts the facts alleged in the complaint as true, but may also consider affidavits submitted by the parties.  *See Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 697 n.1 (2d Cir. 2009) (citing *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 645 (2d Cir. 1956)).

a residence there. (*See* Compl. ¶ 7.) As a practical matter, therefore, New York is not inconvenient in relation to his residence.

Second, the availability of witnesses and evidence in New York supports, albeit only slightly, the view that Shalva selected this forum for reasons of convenience. "[A]t the first step of [the *forum non conveniens*] analysis, the issue is not whether witnesses and evidence are unavailable in the defendant's preferred forum, but whether they are more available in plaintiff's chosen foreign forum than in its home forum." *Norex Petroleum*, 416 F.3d at 156. Shalva contends that the bulk of the relevant witnesses and documents are located in the United States, and principally in New York, while Tatiana argues that they are found in Russia. (*See* Dkt. No. 46, Affidavit of Courtney L. Weiner, Ex. 1, Declaration of Shalva Chigirinskiy ("Shalva Decl."), ¶ 11; Dkt. No. 55, Reply Memorandum of Law in Support of Motion to Dismiss ("Reply Memo"), at 5–6.) Both parties appear to overstate their positions to some extent, but the Court is persuaded that the relevant evidence in this case is somewhat "more available" in New York and Connecticut than it is in Russia. Tatiana has identified several witnesses in Russia who would be unable to travel to the United States to testify here (Grechishkina Decl. Ex. 2, Declaration of Tatiana Panchenkova ("Tatiana Decl."), ¶ 20), but it appears to the Court that central witnesses—including the parties themselves—and the bulk of documents related to the disputed property are located in the United States. This supports the view that Shalva selected New York on the basis of convenience.

Third, Tatiana is a citizen of the United States and is therefore amenable to suit here. (*See* Dkt. No. 19.) This fact, however, does not automatically weigh in Shalva's favor, as a "plaintiff's choice of the defendant's home forum will not, by itself, warrant a presumption of convenience." *Norex Petroleum*, 416 F.3d at 155 (quoting *Pollux Holding Ltd. v. Chase*

19

*Manhattan Bank*, 329 F.3d 64, 74 (2d Cir. 2003)) (internal quotation marks omitted).  Rather, a "plaintiff's choice to initiate suit in the defendant's home forum—as opposed to any other where the defendant is also amenable to suit—only merits heightened deference to the extent that the plaintiff and the case possess *bona fide* connections to, and convenience factors favor, that forum."  *Pollux Holding*, 329 F.3d at 74.  Tatiana is also a citizen of Russia (Def. Memo at 3), and is presumably subject to suit there.  This factor, therefore, neither bolsters nor undermines the claim that this forum was chosen for convenience.[10]

On the other side of the ledger, the relevant factors do not tend to show that Shalva's choice of this forum "was motivated by forum-shopping reasons."  *Iragorri*, 274 F.3d at 72. Tatiana has offered no proof that Shalva's decision to bring the action in New York represents an "attempt[] to win a tactical advantage resulting from local laws that favor the plaintiff's case" or has any connection to "the habitual generosity of juries" or "the plaintiff's popularity or the defendant's unpopularity" in the United States or New York.  *Id.*  Tatiana asserts that Shalva sued here "presumably because he thinks an American court would be more favorable" (Def. Memo at 10), but offers little to substantiate that claim.  Indeed, both parties appear to agree that Shalva's most recent suit against Tatiana in Russia failed not because of unfavorable local laws, but instead because Shalva had failed to essentially notarize relevant documents.  (*Id.* at 25–26; Opp. Memo at 24.)  And the last "forum-shopping factor"—the "inconvenience and expense to the defendant resulting from litigation in [the chosen] forum," *Iragorri*, 274 F.3d at 72—is decidedly in Shalva's favor.  Defending this action in New York is sure to cause Tatiana some

---

[10] Neither party has identified facts relevant to the "availability of appropriate legal assistance" factor or raised "other reasons relating to convenience or expense."  *Iragorri*, 274 F.3d at 72.

inconvenience and expense—she says that she will be required, for example, to translate the testimony of witnesses in Russia who might be deposed there (Def. Memo at 13)—but litigation in Russia, where Tatiana has not lived for several years and is far from Tatiana's current home in Connecticut, is likely to be more burdensome for her.

The Court recognizes, to be sure, that "even when a foreign plaintiff's decision to sue in the United States is not obviously informed by forum shopping, there may be little reason to assume that it is convenient for the plaintiff." *Norex Petroleum*, 416 F.3d at 155 (internal quotation marks omitted). In this case, however, the possibility that Shalva's decision to bring this action was motivated by convenience is a real one, and there is insufficient evidence of forum-shopping to conclude otherwise. The Court is accordingly persuaded that some deference is owed to Shalva's decision to litigate here.

### b. Adequate Alternative Forum

Russia is an adequate alternative forum for this dispute. Shalva's main argument to the contrary is that the parties, the disputed property, and the relevant evidence are all in the United States. As noted above, however, an alternative forum is adequate if "(1) the defendant[] [is] subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Bank of Credit & Commerce Int'l*, 273 F.3d at 246 (internal quotation marks omitted). Tatiana consents to jurisdiction in Russia and has submitted expert evidence showing that Russian courts could entertain the property claims Shalva asserts here. (*See* Tatiana Decl. ¶ 39; Ryabchenko Decl. ¶¶ 159–63.) Russia is therefore an adequate alternative forum.

### c. Private and Public Interest Factors

The private and public interest factors do not weigh decisively in favor of either Shalva or Tatiana.

As noted above, the private interest factors to be considered are: "(1) ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of willing witnesses' attendance; (4) if relevant, the possibility of a view of premises; and (5) all other factors that might make the trial quicker or less expensive." *DiRienzo*, 294 F.3d at 29–30.  The first and second factors, Tatiana contends, point toward Russia as the more convenient forum: determining whether property is jointly owned or solely owned by Shalva will require translation and authentication of Russian legal documents, and there are ten Russian witnesses who would be unwilling to travel to the United States to testify.  (Def. Memo at 13–14.)  The third and fourth factors are not relevant here, but as to "other factors" relating to speed and expense, Tatiana argues that litigating the case in New York will require her to obtain both Russian legal advice and appraisals for the "Russian icons and antiques" that might be among the parties' property.[11]  (*Id.* at 12–15.)

The private interest factors are, at best, neutral.  The first factor weighs against Tatiana. She has made an insufficient showing that Russian legal documents will play an important part in establishing the ownership of the parties' property or that there is a significant number of such documents.  Shalva, on the other hand, points to documents that, while potentially available in a Russian action, are more easily accessible in New York.  (*See* Shalva Decl. ¶¶ 10–11.)  The

---

[11] Tatiana urges the Court to consider here the fact that this action is "vexatious and oppressive." (Def. Memo at 12–13.)  As evidence, she points to the "impertinent and scandalous" allegations in the Complaint and the "baseless" nature of the claims.  (*Id.* at 12.)  This argument has no merit.  The case law counsels that "plaintiffs should not [be] deprived of their choice of forum except upon defendants' clear showing that a trial in the United States would be so oppressive and vexatious to them as to be out of all proportion to plaintiffs' convenience."  *DiRienzo*, 294 F.3d at 30.  The Court reads "oppressive and vexatious" in this context to refer to the burden on a defendant of litigating in a distant forum, not to the merits of a plaintiff's action, but either way, the Court could not conclude at this stage that Shalva's action is "oppressive and vexatious."

second factor weighs slightly in Tatiana's favor.  She has identified several witnesses in Russia

who will testify about her and Shalva's relationship but would be unwilling to come to the

United States.  (Def. Memo at 13.)  Shalva has identified several relevant witnesses in the United

States (Shalva Decl. ¶ 11), but has not shown that these witnesses would be unavailable or

unwilling to testify in Russia.  At the same time, Tatiana concedes that some of her Russian

witnesses will be available for depositions if the action is tried here.  *See, e.g.*, *Overseas*

*Programming Companies, Ltd. v. Cinematographische Commerz-Anstalt*, 684 F.2d 232, 235 (2d

Cir. 1982) ("[A]ny difficulties that the Court might encounter regarding witnesses whose

attendance the Court is unable to compel can most likely be resolved by the use of deposition

testimony or letters rogatory.")  As to the "other factors" that Tatiana emphasizes, the burdens on

her are speculative.  She argues that she "may" need to translate other Russian legal documents

or obtain reports or testimony from a Russian legal expert, but is vague about precisely what she

requires or what the associated expense would be.  (Def. Memo at 14.)  Nor does she explain

why it would be burdensome to find an appraiser for the "Russian icons or antiques" in New

York or elsewhere in the United States.  In short, the private interest factors are either neutral or

against Tatiana.

The relevant "public interest" factors, again, are "(1) administrative difficulties associated

with court congestion; (2) the unfairness of imposing jury duty on a community with no relation

to the litigation; (3) the local interest in having localized controversies decided at home; and (4)

avoiding difficult problems in conflict of laws and the application of foreign law."  *DiRienzo*,

294 F.3d at 31 (internal quotation marks omitted).  Tatiana contends that all four weigh in her

favor: the Southern District of New York "is one of the busiest in the United States"; the

litigation has no "*bona fide* connection" to New York; Russia has a strong interest in resolving

this dispute; and, because Russian law governs Shalva's claims, a Russian court would be better suited to resolve this dispute.  (Def. Memo at 15–18.)

The Court is not persuaded that any of these factors favors Tatiana.  First, there is no reason to believe that the Russian court would handle this case more expeditiously than this Court.  *See Cromer Fin. Ltd. v. Berger*, 158 F. Supp. 2d 347, 355 (S.D.N.Y. 2001) ("While the docket of the Southern District is an active one, courts in this district have shown themselves more than able to address the issues that arise in complex actions in an expeditious and comprehensive manner.").  Second, the community bears a strong relation to this litigation.  As discussed above, Shalva's causes of action are strongly connected to New York, and much of the property in dispute is in this state.  Third, and relatedly, while Russia may have some interest in having this dispute resolved in its courts, it is not a "localized" controversy: the parties are not currently domiciled in Russia, much of the disputed property is not there, and many of the events relevant to this action did not occur there.  Finally, because all the claims except Shalva's fraudulent inducement cause of action are governed by either New York or Connecticut law, the application of foreign law is not likely to be a significant obstacle.  In sum, the public interest factors do not favor dismissal.

### d.  Conclusion

In light of the above, the Court finds that Tatiana has not discharged her burden of showing that New York is a "genuinely inconvenient" forum and that Russia is "significantly preferable."  *Iragorri*, 274 F.3d at 74–75.  Her motion to dismiss for *forum non conveniens* is therefore denied.

24

### D. Comity

Tatiana also argues that Shalva's suit should be dismissed based on principles of comity. This argument fails.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2000) ("*Bigio I*") (quoting *Hilton v. Guyot,* 159 U.S. 113, 164 (1895)) (internal quotation marks omitted).  The term "international comity" is used to describe "two distinct doctrines" that reflect that recognition: first, a "canon of construction [that] might shorten the reach of a statute," and second, "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state."  *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996); *accord Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006) ("*Bigio II*").  This second breed of comity, known as "comity among courts" or "adjudicatory comity," *In re Maxwell*, 93 F.3d at 1047; *Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014), is based on principles of "proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency," *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006).  Under this variant of comity, the court has the discretion to "decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005).  "The task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification *for* the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction." *Royal & Sun Alliance Ins. Co. of Canada*, 466 F.3d at 93.  In this context, the court should evaluate the

"totality of the circumstances," including, but not limited to, "the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction."  *Id.* at 94 (internal quotation marks omitted).

Tatiana argues that Shalva's suit warrants dismissal because the action properly belongs in Russia.  This dispute, she contends, is "between two Russians who lived, married, and divorced in Russia . . . and continues to be litigated in pending proceedings filed by Shalva in Russia to this day."  (Def. Memo at 20.)  There appears to have been some overlap between this action and the most recent action litigated in Russia, but Tatiana does not meaningfully contest that all relevant proceedings in Russia are now over.[12]  Rather, she contends that a pending case in a foreign jurisdiction is not a prerequisite to comity-based abstention.  (Reply Memo at 8.)

The case law suggests otherwise.  *See JP Morgan Chase Bank*, 412 F.3d at 418; *Royal & Sun Alliance Ins. Co. of Canada*, 466 F.3d at 92 (referring to "comity of the courts" as "the recognition of a pending foreign proceeding that has yet to reach final judgment, and that proper deference to that proceeding requires abstention in domestic courts"); *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 210 (S.D.N.Y. 2002) ("[F]ederal courts have the inherent, discretionary power to abstain from exercising . . . jurisdiction in order to extend comity to related proceedings pending in other countries.");

---

[12] In fact, Tatiana cites no evidence to support her claim that the proceedings in Russia are ongoing.  She acknowledges that a Russian court upheld the 2013 Judgment on May 14, 2013 (Def. Memo at 25 (citing Ryabchenko Decl. ¶ 116)), and that a Russian court dismissed Shalva's separate claim with respect to two Moscow apartments on July 17, 2014 (*id.* at 6; Ryabchenko Decl. ¶¶ 4–6).

*Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 412 (E.D.N.Y. 2007) ("The doctrine of international comity provides that, in certain circumstances, a federal court will . . . dismiss a case before it in deference to a parallel action pending in a foreign jurisdiction.").[13] But even if pendency of a parallel proceeding in a foreign jurisdiction is not a prerequisite to comity abstention, the Court's ultimate conclusion that this action should not be dismissed would be unaffected. As discussed in the analysis of *forum non conveniens* (above) and *res judicata* (below), the exceptional circumstances warranting abstention on the basis of comity are not present. Tatiana's motion to dismiss on the basis of international comity is accordingly denied.

### E. Res Judicata

Tatiana argues, next, that portions of Shalva's action are barred by *res judicata*, or claim preclusion.

In an action founded on diversity jurisdiction, "the law of the forum with respect to comity should be applied." *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 664 (S.D.N.Y. 1996), *aff'd*, 122 F.3d 1055 (2d Cir. 1997); *see RA Global Servs., Inc. v. Avicenna Overseas Corp.*, 843 F. Supp. 2d 386, 389 n.2 (S.D.N.Y. 2012). In New York, *res judicata* "bar[s] successive litigation based upon the same transaction or series of connected transactions

---

[13] Tatiana cites the Second Circuit's decision in *Bigio*, 239 F.3d 440, in support of her position, but this case is inapposite. The issue in *Bigio* was one of international comity in a different sense: whether adjudication of the suit in the United States "would offend amicable working relationships" with Egypt, where the plaintiffs' claims arose. *Bigio II*, 448 F.3d at 178 (internal quotation marks omitted); *see also Bigio I*, 239 F.3d at 454 ("[International comity] may (*although it does not in this case*) take the form of a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." (internal quotation marks omitted) (emphasis added)). Tatiana has neither alleged nor made any showing that adjudication of Shalva's suit here would have such an impact on the United States' relations with Russia. *Bigio* is therefore inapplicable here.

if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was." *RA Global Servs.*, 843 F. Supp. 2d at 389 (quoting *New York v. Applied Card Sys., Inc.*, 894 N.E.2d 1, 12 (N.Y. 2008)) (internal quotation marks and footnote omitted). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *Specialized Realty Servs., LLC v. Maikisch*, 999 N.Y.S.2d 430, 431 (App. Div. 2d Dep't 2014) (quoting *O'Brien v. City of Syracuse*, 429 N.E.2d 1158, 1159 (N.Y. 1981)); *see also Marinelli Assocs. v. Helmsley-Noyes Co.*, 705 N.Y.S.2d 571, 574 (App. Div. 1st Dep't 2000) ("[*Res judicata*] bars not only claims that were actually litigated but also claims that could have been litigated, if they arose from the same transaction or series of transactions.")  Whether a claim arises out of a transaction or series of transactions, for purposes of *res judicata*, turns on "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Xiao Yang Chen v. Fischer*, 843 N.E.2d 723, 725 (N.Y. 2005) (internal quotation marks omitted).  *Res judicata* is an affirmative defense, and the party asserting it bears the burden of proof of showing that it applies. *Alesayi Beverage Corp.*, 947 F. Supp. at 655 n.10.

Tatiana asks that the court give preclusive effect to both the 2009 Judgment and the 2013 Judgment.  In the 2009 Judgment, Tatiana contends, the Russian court concluded that the gifts made by Shalva to Tatiana via the Deeds were not marital assets, because "any assets received by either spouse during the life in matrimony as a gift, as inheritance or under any otherwise [*sic*] without consideration (known as personal assets of each spouse) are owned by such spouse."

(Def. Memo at 23–24 (quoting 2009 Judgment at 12).)  According to Tatiana, the Russian court

also rejected Shalva's claim that the gifts had not been transferred.  (*Id.*)  With respect to the

2013 Judgment, Tatiana alleges that the Russian court's determination that Shalva failed to prove

ownership with respect to the "Old Apartments" is binding and precludes Shalva from

reasserting a claim to those apartments in this action.  (*Id.* at 25–26.)

There is no bar to Shalva's claims with respect to the Deeds, except insofar as Shalva

claims that the gifts transferred thereunder are marital property for which Shalva is owed

compensation.  The 2009 Judgment rejected these latter claims.  But it did not address—nor

could it have addressed—the claim made here that the Deeds were fraudulently induced by

Tatiana's "explicit and repeated representations that it would be preserved by her in trust for her,

her son from a former marriage and their four children in specific shares."  (Compl. ¶ 14.)

Shalva alleges that he did not discover that Tatiana failed to adhere to these representations until

after the parties' divorce in 2009.  That Shalva's claim is "implausible on its face" (Def. Memo

at 25), even if true, is unrelated to whether it is foreclosed by *res judicata*.  In short, taking the

allegations in the Complaint as true, Shalva's claim that the Deeds were fraudulently induced

was neither litigated nor "could have been litigated" in the 2009 action.  *Marinelli Assocs.*, 705

N.Y.S.2d at 574.

On the other hand, Shalva *is* precluded from challenging the holding in the 2013

Judgment that he has no claim to the Old Apartments.  Shalva argues that, at least with respect to

these apartments, the 2013 Judgment is not "a decision on the merits" because it rejected his

claim on "technical or procedural grounds."  (Opp. Memo at 24.)  But characterizing the decision

in this fashion does not alter the fact that the 2013 Judgment is, in essence, a final judgment.  The

court reached the merits of the claim and decided against Shalva because of the insufficiency of

the evidence he presented.  *See* 10 Weinstein, Korn & Miller, New York Civil Practice ¶ 5013.03 (2014) ("Generally, . . . dismissal for failure of proof is a dismissal on the merits.")  Shalva does not allege, and nor does it appear to the Court, that the Russian court dismissed his claims before the close of his evidence.  *See* NY CPLR § 5013 ("[A] judgment dismissing a cause of action after the close of the proponent's evidence is a dismissal on the merits unless it specifies otherwise.").  The cases that Shalva cites in support of his position are inapposite, because they involve instances in which *res judicata* did not apply because the first court declined to adjudicate the issue in question.  *See Frischknecht v. Novaes*, 924 N.Y.S.2d 814, 814 (App. Div. 2d Dep't 2011) ("The plaintiff's claim for the distribution of the marital residence and other assets is not barred by the doctrines of res judicata and collateral estoppel, since the Brazilian court expressly declined to adjudicate the issue after it was raised by the parties."); *Cudar v. Cudar*, 946 N.Y.S.2d 630, 634 (App. Div. 2d Dep't 2012) (concluding that *res judicata* was no bar to the defendant's claim because the previous court "stated that it could not decide" the claim).  Here, in contrast, the Russian court decisively rejected Shalva's claim that the "Old Apartments" are the parties' joint property—and that Shalva is accordingly entitled to compensation for them—as "far-fetched, unsubstantiated, [and] unlawful," and held that the claim "shall not be allowed."  (2013 Judgment at 10.)[14]

---

[14] Nor is this case analogous to *Wilson v. N.Y.C. Hous. Auth.*, 791 N.Y.S.2d 567 (App. Div. 2d Dep't 2005), in which the court explained that *res judicata* does not bar an action where the previous suit was dismissed for "failure to comply with a condition precedent to the commencement of an action against defendant." *Id.* at 568.  The condition precedent there—the plaintiff's compliance with General Municipal Law § 50-h—related to the plaintiff's ability to bring the action; the court did not reach the merits of the plaintiff's claim.  Here, however, the condition precedent—essentially, a requirement that documents be notarized—went to Shalva's burden of proof and the merits of his claim.

Accordingly, *res judicata* bars Shalva from contesting the ownership of the Old Apartments, referred to in the 2013 Judgment, and from claiming that the gifts transferred under the Deeds are marital property.  He is not, however, precluded from arguing that the Deeds should be rescinded because they were procured by fraudulent misrepresentations on Tatiana's part.

### F.  Statute of Limitations

Next, Tatiana argues that some of Shalva's claims should be dismissed because the statute of limitations applicable to those claims has expired.

"When a nonresident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued." *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 484 (N.Y. 1999).  The purpose of the rule is to prevent nonresidents from forum-shopping for a more favorable statute of limitations.  *Id.*  A cause of action "accrues" under CPLR § 202 "where the injury is sustained rather than where the defendant committed the wrongful acts." *Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999).  "Where an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Global Fin. Corp.*, 715 N.E.2d at 485.

Tatiana contends that certain of Shalva's claims—claims in connection with "marital personal property" and the conversion claim—are time-barred.  (Def. Memo at 27–28.)  She argues, first, that the limitations period for claims related to marital property was triggered by the Russian divorce proceedings.  Under Russian law, Tatiana explains, parties to a divorce proceeding are not required to divide all of their marital property within that proceeding; they may continue to hold it jointly and seek division later.  (Reply Memo at 12; Ryabchenko Decl. ¶

66.)  If, however, a former spouse "subsequently interferes with the other's rights in marital property, the other has three years to request division of that marital property, after which the claim is barred."  (Reply Memo at 12 (citing Ryabchenko Decl. ¶¶ 26–49, 63–72).)  This three-year period, Tatiana alleges, began running in 2010, when Tatiana is said to have interfered with Shalva's rights to the marital property "by refusing to give it to him or [by] selling it."  (*Id.*)  Tatiana contends, second, that the same is true for Shalva's conversion claim in connection with property he owned before the marriage: Shalva should have known of the alleged conversion no later than August 2010, and his claim is therefore time-barred regardless of which law applies.  (*Id.* at 13–14.)

Tatiana's first argument fails.  New York's borrowing statute applies only where the plaintiff's claims accrue outside New York.  Here, Shalva's claims arise from Tatiana's alleged sale of property belonging, in whole or in part, to Shalva, and her alleged refusal to return Shalva's share of that money or other property to him.  Tatiana does not contest that these are events that took place in New York or Connecticut.  The borrowing statute is therefore no obstacle to Shalva's claims in connection with the parties' marital property, even if such claims are in fact time-barred in Russia. [15]

Tatiana's argument that the conversion claim is time-barred is premature at this stage, and therefore also fails.  "Under New York law, conversion claims are subject to a three-year statute of limitations, which begins running when the alleged conversion takes place." *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) (citing, *inter*

---

[15] Apart from the conversion claim, Tatiana does not argue that Shalva's claims are time-barred under New York or Connecticut law.

*alia*, NY CPLR § 214(3)) (brackets and internal quotation marks omitted).  This rule is not without exception: "Where possession is originally lawful, a conversion does not occur until the owner makes a demand for the return of the property and the person in possession of the property refuses to return it."  *In re Rausman*, 855 N.Y.S.2d 263, 264 (App. Div. 2d Dep't 2008).  But this exception "has no application in a case where the lawful custodian of property commits an overt and positive act of conversion by an unlawful sale or disposition of the same."  *Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007) (quoting *MacDonnell v. Buffalo Loan, Trust & Safe Deposit Co.*, 85 N.E. 801, 803 (N.Y. 1908)), *aff'd*, 268 F. App'x 17 (2d Cir. 2008); *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, __ F. Supp. 3d __ , 2015 WL 72828, at *4 (S.D.N.Y. Jan. 6, 2015) ("[A]n action for conversion only arises if plaintiff made demands for return of the property or a defendant wrongfully transferred or dispossessed of it before a demand was made.").  The Complaint alleges that Tatiana, the lawful custodian of the property at the relevant time, began to unlawfully dispose of property in which Shalva had at least some interest even before the parties ceased cohabitation in 2010.  (*See, e.g.*, Compl. ¶ 33.)  This suggests that at least some of Shalva's claims may be time-barred.  But the facts necessary to determine whether the conversion claim is fully time-barred are not before the Court, and it would therefore be premature to dismiss the claim at this juncture.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12-CV-3723 (RJS), 2013 WL 1294668, at *8 (S.D.N.Y. Mar. 28, 2013) ("[I]n the statute of limitations context[,] . . . dismissal is appropriate only if a complaint clearly shows the claim is out of time." (quoting *Harris v. City of New York*,

186 F.3d 243, 250 (2d Cir. 1999) (internal quotation marks omitted))).  Tatiana's motion to dismiss the conversion claim is accordingly denied.[16]

### G.  Dismissal Under Rule 12(b)(6)

Tatiana also moves to dismiss all of Shalva's claims for failure to state a claim upon which relief may be granted.

To survive a motion to dismiss under Federal Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The standard of "facial plausibility" is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Plausibility is distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely."  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 556) (internal brackets and quotation marks omitted).  At the same time, a court is "not bound to accept as true a legal conclusion couched as a factual

---

[16] On this point, Connecticut's law is not materially different from that of New York's. *See Stuart & Sons, L.P.*, 456 F. Supp. 2d at 343–44 ("There are two classes of conversion. . . .  In the first class of conversion the possession is wrongful from the outset. . . .  The second class of conversion occurs when the possession is originally rightful, but becomes wrongful as a result of: (1) a wrongful detention; (2) a wrongful use of the property; or (3) the exercise of an unauthorized dominion over the property.  With regard to the first instance, where the original possession is authorized, but becomes wrongful when the property is detained without authorization, a conversion does not occur until the possessor refuses to return the property on demand. . . .  In the other two instances in the second class of conversion, either the wrongful use or the unauthorized dominion constitute the conversion and no demand for the return of the property is necessary.  Thus, the statute of limitations in either case begins to run when a party, publicly or outwardly, exhibits wrongful use or unauthorized dominion over the property." (citations omitted)).

allegation." *Twombly*, 550 U.S. at 555 (internal quotation mark omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### 1. Breach of Contract

Tatiana contends that Shalva's breach of contract claim is barred by Russia's statute of frauds.  As noted above, however, New York or Connecticut law applies to the breach of contract claim here.  Neither state's statute of frauds bars this claim.

New York's statute of frauds renders void an agreement that has not been reduced to writing if "[b]y its terms [it] is not to be performed within one year from the making thereof." N.Y. Gen. Oblig. Law § 5-701; *Cron v. Hargro Fabrics, Inc.*, 694 N.E.2d 56, 58 (N.Y. 1998). The Court of Appeals has interpreted this provision "to encompass only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year." *Cron*, 694 N.E.2d at 58 (internal quotation marks omitted).  "[I]f the terms of the contract include an event that might end the contractual relationship within a year, the contract is not within the Statute of Frauds." *Rackson v. Sosin*, 14 F. App'x 23, 24–25 (2d Cir. 2001) (summary order) (citing *Cron*, 694 N.E.2d at 60).  Connecticut has a similar rule.  *See C.R. Klewin, Inc. v. Flagship Properties, Inc.*, 955 F.2d 5, 6 (2d Cir. 1992) ("[A]n oral contract that does not say, in express terms, that performance is to have a specific duration beyond one year is, as a matter of law, the functional equivalent of a contract of indefinite duration for the purposes of the statute of frauds.  Like a contract of indefinite duration, such a contract is enforceable because it is outside the proscriptive force of the statute regardless of how long completion of performance will actually take." (quoting *C.R. Klewin v. Flagship Properties*, 600 A.2d 772, 779 (Conn. 1991) (internal quotation marks omitted))).

35

The statute of frauds is therefore no bar to Shalva's breach of contract claim.  The claim, as the Complaint describes it, is based on Shalva and Tatiana's alleged agreement, made in 2009, that personal property—both jointly owned and solely owned by Shalva—that was sent to the United States or stored in Europe would be "enjoyed by them jointly and for the benefit of their family while they cohabited with their children in the United States." (Compl. ¶ 44.)  The duration of the performance contemplated in the contract—the parties' cohabitation in the United States—was one that could have exceeded, and in fact slightly did exceed, one year.  But it could have also lasted less than a year.  Put otherwise, there is nothing in the contract's terms, according to the Complaint, that would have required the contract's duration to be greater than one year.  Tatiana's motion to dismiss is accordingly denied as to Shalva's breach of contract claim.

### 2. Conversion

"Conversion is the 'exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession.'" *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 147 (S.D.N.Y. 2000) (quoting *Lopresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997)); *Stuart & Sons, L.P. v. Curtis Pub. Co.*, 456 F. Supp. 2d 336, 343 (D. Conn. 2006) ("Conversion occurs when one, without authorization, assumes and exercises a right of ownership of property belonging to another to the exclusion of the owner's rights.").  A plaintiff suing for conversion must allege "legal ownership of a specific identifiable piece of property and the defendant's exercise of dominion over or interference with the property in defiance of the plaintiff's rights." *Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 413 (S.D.N.Y. 2007) (quoting *Ahles v. Aztec Enters., Inc.*, 502 N.Y.S.2d 821, 822 (App. Div. 3d Dep't 1986)) (internal quotation marks omitted).

36

Tatiana argues that Shalva cannot maintain a conversion claim in connection with the parties' marital property, because it is property to which "Tatiana has joint title or rights." (Def. Memo at 30.) This is incorrect. The fact that a defendant partly owns some property does not foreclose the possibility that the defendant's conduct may give rise to a conversion claim. *See, e.g.*, *Farkas v. Farkas*, No. 95-CV-8464 (HB), 1997 WL 411920, at *1 (S.D.N.Y. July 23, 1997); *Durso v. Vessichio*, 828 A.2d 1280, 1289 (Conn. App. Ct. 2003) (sustaining finding of conversion on basis that plaintiff had "an ownership interest" in property). Shalva's allegation here is that Tatiana interfered with his right to the parties' marital property by refusing to return the property or selling it and not paying Shalva any of the proceeds. No more is required to allege conversion. Tatiana's motion to dismiss Shalva's claim for conversion is therefore denied.[17]

### 3. Unjust Enrichment

Tatiana seeks dismissal of Shalva's unjust enrichment claim on the ground that it is duplicative of his conversion claim. (Reply Memo at 15 n.7.)[18] "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."

---

[17] Tatiana cites *KS v. ES*, No. 303920/10, 2013 WL 1799039 (N.Y. Sup. Ct. April 4, 2013), in support of her position that Shalva's conversion claim is untenable because he and Tatiana had equal rights to the property. *KS*, however, addressed a conversion claim by one spouse against the other for conduct during their marriage. *See id.* at *8 ("[I]f the titled spouse could claim that the non-titled spouse had stolen[] his or her personal property every time the non-titled spouse used that property during the marriage, the Domestic Relations Law and its recognition of marriage as an economic partnership would be completely undermined." (citation omitted)). *KS* is therefore distinguishable.

[18] Tatiana also argues that the unjust enrichment claim should be dismissed because: (1) it is duplicative of claims Shalva could have brought in Russia, and (2) Shalva is using it to cure a defect in his breach of contract claim, namely, the fact that it is barred under the Russian statute of frauds. (Opp. Memo at 31–32.) Neither argument succeeds because, as noted above, Russian law does not govern this claim.

*Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). Nonetheless, unjust enrichment may be pleaded in the alternative to breach of contract. *See, e.g.*, *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010) ("At the pleading stage, Plaintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims."); *Stein v. Horton*, 914 A.2d 606, 613 (Conn. App. Ct. 2007) ("Parties routinely plead alternative counts alleging breach of contract and unjust enrichment . . . ."). Tatiana's motion to dismiss Shalva's unjust enrichment claim is accordingly denied.

### 4. Fraudulent Inducement

Tatiana moves to dismiss Shalva's fraudulent inducement claim on the basis that all of the Deeds contain an integration clause. (Def. Memo at 32; Reply Memo at 11.) Because the parties have not briefed the relevant Russian law on rescission based on fraudulent inducement, the Court is unable to determine whether the integration clauses in the Deeds foreclose this claim. Tatiana may argue on summary judgment that it does. But her motion to dismiss this claim is denied.

### 5. Accounting and Constructive Trust

Tatiana's basis for seeking dismissal of Shalva's final two claims—for accounting and a constructive trust—is that these "are merely requests for relief and not causes of action." (Def. Memo at 33.) This contention has merit under Connecticut law, but not under New York law. *Compare Cendant Corp. v. Shelton*, 474 F. Supp. 2d 377, 383 (D. Conn. 2007) ("[T]here is no separate cause of action under Connecticut law for constructive trust . . . .") *and Macomber v. Travelers Prop. & Cas. Corp.*, 804 A.2d 180, 184 n.3 (Conn. 2002) (noting that accounting and constructive trust are "remedies" rather than "substantive causes of action"), *with Reiner v. Jaeger*, 855 N.Y.S.2d 613, 614 (App. Div. 2d Dep't 2008) (referring to "[a] cause of action to

impose a constructive trust") *and DiTolla v. Doral Dental IPA of New York*, 469 F.3d 271, 275

(2d Cir. 2006) ("Under New York law, an accounting is a distinct cause of action rooted in

equity.")  Because it is unclear at this juncture which state's law governs these claims, Tatiana's

motion to dismiss is denied without prejudice to renewal at a later date.

### H.  Motion to Strike

Finally, Tatiana moves to strike portions of the Complaint.  She takes issue with the

existence of three allegations in particular: (1) that the parties' "intimate relationship and co-

habitation" both preceded and followed their formal marriage (Compl. ¶ 17); (2) that Tatiana and

Shalva had their first child while married to other people, and then married after divorcing their

previous spouses (*id.* ¶ 18); and (3) that Tatiana "massively undervalued many of the items" in

the Collection on "documents including customs declarations" when she had them shipped to the

United States or sent to secure storage (*id.* ¶ 32).  Tatiana also contends that Shalva disseminated

the Complaint—including the above "immaterial, impertinent, and scandalous information"—to

individuals both within and outside the United States, thereby confirming that the purpose of the

suit is "to harm Tatiana by manipulating the legal process."  (Dkt. No. 17, Defendant's Motion to

Strike, at 7.)  Tatiana's arguments are without merit.

Federal Rule 12(f) empowers a court, acting on its own or on a motion made by a party,

to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or

scandalous matter."  "[C]ourts should not tamper with the pleadings unless there is a strong

reason for so doing," and should not ordinarily "strike a portion of the complaint on the grounds

that the material could not possibly be relevant on the sterile field of the pleadings alone."

*Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).  "To prevail on a

motion to strike, the defendant must show that: (1) no evidence in support of the allegations

would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Hargett v. Metro. Transit Auth.*, 552 F. Supp. 2d 393, 404 (S.D.N.Y. 2008) (quoting *M'Baye v. World Boxing Ass'n*, No. 05-CV-9581 (DC), 2007 WL 844552, at *4 (S.D.N.Y. Mar. 21, 2007)) (internal quotation marks omitted).[19]

None of the allegations identified by Tatiana are "immaterial, impertinent, or scandalous" within the meaning of Rule 12(f). The first two allegations, which are related to the duration of the parties' relationship and the context in which it arose, are not obviously irrelevant to the action. If true, they establish that the parties' relationship was not limited to the period of their formal marriage. That point, in turn, is not unrelated to the question of whether Shalva and Tatiana had an agreement about how they would treat property acquired before and after marriage. That Shalva and Tatiana had an extramarital affair and had their first child out of

---

[19] Tatiana argues that this standard sets the bar too high. Instead, she quotes *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 555 (S.D.N.Y. 2002), for the proposition that "allegations may be stricken if they have no real bearing on the case, will likely prejudice the movant, *or* where they have criminal overtones." (Dkt. No. 29, Defendant's Reply Memo in Support of Motion to Strike, at 2.) But the Court does not read *G-I Holdings* to alter the well-established rule that allegations should not be struck where they may bear on the action. *See, e.g.*, *Schoolcraft v. City of New York*, 299 F.R.D. 65, 67 (S.D.N.Y. 2014) ("It is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action." (brackets and internal quotation marks omitted)); *Lennon v. Seaman*, 63 F. Supp. 2d 428, 446 (S.D.N.Y. 1999) ("Motions to strike, however, are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation." (internal quotation marks omitted)); *Eaton v. Am. Media Operations, Inc.*, No. 96-CV-6158 (MBM), 1997 WL 7670, at *5 (S.D.N.Y. Jan. 9, 1997) (same). And although some courts have stated that a relevant but prejudicial allegation may be struck where "the severity of the prejudice outweighs the materiality of the allegation," *Orientview Technologies LLC v. Seven For All Mankind, LLC*, No. 13-CV-0538 (PAE), 2013 WL 4016302, at *3 (S.D.N.Y. Aug. 7, 2013) (internal quotation marks omitted), that is not the case here.

wedlock—allegations that Tatiana says are no more than "salacious details" (Dkt. No. 29, Defendant's Reply Memo in Support of Motion to Strike, at 3)—are not necessarily immaterial, and do not warrant the extraordinary remedy that Tatiana seeks.

The same is true of the third allegation: that Tatiana understated the value of items in the Collection on customs declarations and other documents.  The proper value of items in the Collection is likely to be a central issue in this litigation, and the accuracy of Tatiana's valuations in documents such as customs declarations—potential evidence of the worth of the Collection— may bear directly on that question.  To be sure, if evidence emerges that Shalva made this or other allegations in the absence of sufficient "evidentiary support," Tatiana may move for sanctions under Rule 11.  *See In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, 712 F. Supp. 2d 255, 263 (S.D.N.Y. 2010) (quoting Fed. R. Civ. P. 11(b)(3)); *Schoolcraft v. City of New York*, 299 F.R.D. 65, 67 (S.D.N.Y. 2014) ("Even if an allegation may not pass Rule 11 scrutiny at a later stage in the litigation it may not be stricken if it has have some possible bearing on the subject matter of the party's claim." (internal quotation marks omitted)).  At this stage, however, the Court is not persuaded that the allegation is entirely irrelevant to the action.

The Court is also not convinced that Shalva acted improperly in sending the complaint to individuals he has identified as potential witnesses in the action.  Tatiana does not allege that the act of disseminating the complaint was wrong, nor does she contend that Shalva sent the complaint to individuals who are not potential witnesses.  Rather, she alleges that the conduct was improper simply because of the nature of the allegations in the complaint.  Because the Court has not found those allegations to be "immaterial, impertinent, or scandalous," this argument is without merit.  Tatiana's motion to strike is therefore denied.

**III.    Conclusion**

For the foregoing reasons, Tatiana's motion to strike is DENIED and her motion to dismiss is GRANTED in part and DENIED in part.  The Clerk of Court is directed to close the motions at docket numbers 17 and 36.

SO ORDERED.

Dated:  March 31, 2015
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

42