UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
SHALVA PAVLOVICH CHIGIRINSKIY,      :

               Plaintiff,      :         <u>OPINION AND ORDER</u>

      -v.-           :
                               14 Civ. 4410 (GWG)
TATIANA ROMANOVNA PANCHENKOVA,   :
et al.
                     :
             Defendants.
------------------------------------------------------------- x

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

      Plaintiff Shalva Pavlovich Chigirinskiy brought this action in June 2014 against his

former wife, Tatiana Romanovna Panchenkova, seeking to recover tens of millions of dollars

worth of property allegedly belonging to Chigirinskiy.  After the parties entered into a

Settlement Agreement, the Court dismissed the case, retaining jurisdiction to enforce the

Settlement Agreement.  The parties have now each moved to enforce the Settlement Agreement.[1]

---

[1]  <u>See</u> Notice of Motion, filed Feb. 15, 2018 (Docket # 293); Defendant Panchenkova's
Memorandum of Law in Support of Her Motion to Enforce Settlement Agreement, filed Feb. 15,
2018 (Docket # 294) ("Def. Mem."); Declaration of Jeffrey M. Eilender in Support of Defendant
Panchenkova's Motion to Enforce Settlement Agreement, filed Feb. 15, 2018 (Docket # 295)
("Eilender Decl."); Legal Expert Declaration of Larisa Nukhimovna Ryabchenko, filed Feb. 15,
2018 (Docket # 296) ("Ryabchenko Decl."); Notice of Cross-Motion, filed Mar. 19, 2018
(Docket # 304); Declaration of Dr. Ilia Rachkov Prepared in Support of the Plaintiff's
Opposition to the Defendant's Motion and in Support of the Plaintiff's Cross-Motion to Enforce
the Settlement Agreement, filed Mar. 19, 2018 (Docket # 305) ("Rachkov Decl."); Declaration
of Mrs. Elena Alexandrovna Oreshnikova, filed Mar. 19, 2018 (Docket # 306); Declaration of
Alexander Iosifovich Povolotskiy, filed Mar. 19, 2018 (Docket # 307) ("Povolotskiy Decl.");
Declaration of George Benaur, Esq. in Opposition to Ms. Panchenkova's Motion and in Support
of Shalva Chigirinskiy's Cross-Motion to Enforce the Settlement Agreement, filed Mar. 19,
2018 (Docket # 308); Plaintiff's Memorandum of Law in Opposition to Defendant's Motion and
in Support of His Cross-Motion to Enforce the Settlement Agreement, filed Mar. 19, 2018
(Docket # 309) ("Pl. Mem."); Letter from George Benaur, filed Mar. 19, 2018 (Docket # 310);
Defendant Panchenkova's Reply Memorandum of Law in Further Support of Her Motion to
Enforce Settlement Agreement and in Opposition to Plaintiff's Cross-Motion, filed Apr. 10,
2018 (Docket # 312) ("Def. Reply"); Reply Legal Expert Declaration of Larisa Nukhimovna

Panchenkova also moves to seal portions of the moving papers and the Settlement Agreement submitted in conjunction with her motion to enforce.[2] The parties have also sought their fees and costs for filing this motion. For the reasons set forth below, Panchenkova's motion to enforce the Settlement Agreement is granted, Chigirinskiy's cross-motion is granted in part and denied in part, and Panchenkova's motion to seal is denied except as specified below. Both parties' requests for costs and fees are denied.

I. BACKGROUND

A. Pre-Settlement Background

The dispute about the Settlement Agreement arises from a series of legal actions between Panchenkova and Chigirinskiy in Russia and the United States relating to their marriage, family, and assets. On April 14, 2009, Chigirinskiy and Panchenkova "were divorced by a Divorce Decree of the Presnenskiy District Court of Moscow, Russia" (hereinafter the "Divorce Decree"). See Settlement Agreement, dated Jan. 18, 2018 (annexed as Ex. 2 to Eilender Decl.),

---

Ryabchenko, filed Apr. 10, 2018 (Docket # 313) ("Ryabchenko Reply Decl."); Supplemental Declaration of Dr. Ilia Rachkov Prepared in Support of the Plaintiff's Opposition to the Defendant's Motion and in Support of the Plaintiff's Cross-Motion to Enforce the Settlement Agreement, filed Apr. 24, 2018 (Docket # 316); Plaintiff's Supplemental Memorandum of Law in Further Opposition to Defendant's Motion and in Further Support of His Cross-Motion to Enforce the Settlement Agreement, filed Apr. 24, 2018 (Docket # 317) ("Pl. Supp. Mem."); Defendant Panchenkova's Supplemental Memorandum of Law in Further Support of Her Motion to Enforce Settlement Agreement and in Further Opposition to Plaintiff's Cross-Motion, filed Apr. 30, 2018 (Docket # 318) ("Def. Supp. Mem.").

[2] Notice of Motion, filed Feb. 15, 2018 (Docket # 297) ("Def. Seal Not."); Defendant Panchenkova's Memorandum of Law in Support of Her Motion to Seal, filed Feb. 15, 2018 (Docket # 298) ("Def. Seal Mem."); Declaration of George Benaur, Esq. in Opposition to Ms. Panchenkova's Motion to Seal, filed Mar. 1, 2018 (Docket # 299) ("Benaur Seal Decl."); Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Seal, filed Mar. 1, 2018 (Docket # 300) ("Pl. Seal Mem."); Reply Declaration of Vitali S. Rosenfeld in Further Support of Motion to Seal, filed Mar. 7, 2018 (Docket # 302).

at 1. On July 3, 2009, the Simonovsky District Court of Moscow, Russia, issued a judgment dividing the parties' marital property between them. Id. at 2. The judgment included a ruling that certain items were gifts from Chigirinskiy to Panchenkova and thus were solely owned by Panchenkova. Id. It also ordered Chigirinskiy to pay Panchenkova "an equalization payment." Id. at 2.

Litigation between Chigirinskiy and Panchenkova followed in both the United States and Russia. The Settlement Agreement reflects that the parties are still opposing each other in a case in Connecticut State Court regarding certain personal matters which, as explained in section IV below, we have ordered sealed (hereinafter the "Connecticut Case"). See id. at 3. In 2012, Panchenkova also initiated an action against Chigirinskiy in Connecticut State Court to enforce the judgment entered by the Simonovsky District Court (hereinafter the "Connecticut Enforcement Action"). Id. at 2. Lastly, Panchenkova initiated several proceedings in Russia to enforce the judgment that was entered in Russia against Chigirinskiy, which are now pending with the Moscow Inter-District Bailiff Service (the "Russian Enforcement Proceeding"). See id. at 2-3. As a result of Russian legal proceedings, Chigirinskiy and Panchenkova each own one-half interests in three apartments in St. Petersburg, Russia. See id. at 3.

In conjunction with the Russian Enforcement Proceeding, Chigirinskiy was assessed a fee by the Moscow Inter-District Bailiff Service of "over 52 million Russian Roubles," or approximately $900,000 (hereinafter the "Bailiff's Fee"). Id.; see also Pl. Mem. at 6; Eilender Decl. ¶ 8. The parties have submitted declarations from experts on Russian law describing the nature of this Fee.[3] These experts agree that the Bailiff's Fee is a "penalty" or "sanction"

---

[3] We may consider these affidavits in adjudicating issues relating to Russian law pursuant to Federal Rule of Civil Procedure 44.1, which provides in relevant part:

imposed on the debtor in an enforcement proceeding that, once paid, is credited directly to the Russian federal government. See Rachkov Decl. ¶¶ 20-21 (describing the Bailiff's Fee as "a monetary penalty imposed on the debtor in case of non-execution of an execution document within the period established for a voluntary execution of the executive document," and that this fee, once paid, is "credited to the [Russian] federal budget"); Ryabchenko Decl. ¶¶ 5, 8 (describing the Bailiff's Fee as "a sanction imposed by the court bailiff, without a court ruling, by his own determination, upon the debtor who fails to comply, within the time period set by the court enforcement bailiff, with lawful demands of the court enforcement bailiff directed at execution of an enforcement document," and further noting that this fee represents "7% of every amount presented to the debtor by the bailiff with an instruction to pay the debt voluntarily within 5 days, and charged once the debtor has failed in that duty in the time period set by the law without good cause.") (emphasis omitted).[4]

On June 5, 2014, Chigirinskiy initiated the instant action seeking, among other things, to recover from Panchenkova "tens of millions of dollars of property that belongs to him,"

---

> In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

[4] Larisa Nukhimovna Ryabchenko, Panchenkova's expert in Russian law, further notes that

> the bailiff Fee is not a payment for any "services rendered" to the creditor; does not in any way depend on the creditor; is not imposed on the debtor at the creditor's request, motion or application; is not a reward or incentive to the bailiff for execution in the creditor's favor; is not any salary or bonus to the bailiff — but constitutes exclusively a **penalty** imposed by the court bailiff upon the **debtor**.

Ryabchenko Decl. ¶ 16 (emphasis in original); accord Ryabchenko Reply Decl. ¶ 5.

including "fine art, religious icons, antiques, unique and valuable decorative objects, jewelry and valuable antiques, and an historic library of Russian literature."[5] See Complaint, dated June 5, 2014 (annexed as Docket # 4-1 to Defendant's Amended Notice of Removal, filed June 25, 2014 (Docket # 4) ("Am. Removal Not.")) ("Compl."), ¶ 1; see also Settlement Agreement at 2. Chigirinskiy sought recovery of this property, or damages in the alternative. See Compl. ¶¶ 43-68, ad damnum; see also Second Amended Complaint, filed Feb. 1, 2016 (Docket # 126) ("SAC"), ¶¶ 53-116, ad damnum. Panchenkova thereafter asserted counterclaims against Chigirinskiy arising from, among other things, his purported failure to pay her as required by prior court orders, including pursuant to the Divorce Decree. See Amended Answer to the Second Amended Complaint and Counterclaims of Tatiana Romanovna Panchenkova, filed May 9, 2017 (Docket # 199) ("Am. Answer"), ¶¶ 76-170.

B. Settlement

On November 15, 2017, after several years of litigation, Panchenkova's counsel in this action wrote the Court stating that the parties had reached a settlement in principle of this matter, and anticipated "executing a written stipulation to that effect in the near future." See Letter from Jeffrey M. Eilender, filed Nov. 15, 2017 (Docket # 276). On December 13, 2017, however, Panchenkova's counsel filed another letter stating that the parties had come to an impasse with respect to one issue, and warned that "the Court's involvement may ultimately be needed to ascertain [the settlement's] specific terms with respect to the one issue that remains unresolved."

---

[5] Chigirinskiy — a citizen of Russia and Israel — initially filed this case in New York State Supreme Court, but Panchenkova — a citizen of Connecticut — removed the case to this Court. See Am. Removal Not. ¶¶ 1, 5.

5

Letter from Vitali S. Rosenfeld, filed Dec. 13, 2017 (Docket # 279), at *1.[6]

The Court held a conference on January 12, 2018. See Memorandum Endorsement of Letter from George Benaur, dated Dec. 20, 2017 (Docket # 284); Minute Entry for Pretrial Conference, dated Jan. 12, 2018. Following the conference, the parties reached a final Settlement Agreement, which was executed by Chigirinskiy on January 18, 2018, and by Panchenkova on January 19, 2018. See Settlement Agreement at 17.

The Agreement provides that each party releases all claims that they "ever had, now have, or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of execution of this Settlement Agreement" against the other party, and that each party covenants not to sue or maintain other legal actions against the opposing party, except for "claim[s] for breach[es] of this Settlement Agreement" and "claims or obligations arising from, relating to or at issue in the [Connecticut Case]." Id. §§ 8-11. The Agreement does not provide for any payments to be made by either party.

Regarding the Russian Enforcement Proceeding, section 4 of the Agreement specifies that the parties shall

> within forty-five business days of the Settlement Agreement becoming effective, . . . execute and exchange, through their respective counsel, any documents sufficient and necessary to dismiss and discontinue all such actions and proceedings with prejudice, with each of the Parties to bear its own costs and attorneys' fees pertaining to such actions and proceedings, and withdrawing any and all claims, motions, subpoenas, liens, costs, fees, and any other legal process pertaining to such actions and proceedings with prejudice and without costs.

Id. § 4. Section 4 also provides that "[i]n the meantime, neither party shall take any actions with

---

[6] Page numbers indicated as "*__" refer to the pagination assigned by the ECF system.

respect to any of the Foreign Enforcement Proceedings and/or the Principal Russian Debt other than those designed to effectuate the dismissal with prejudice and discontinuance of such proceedings and/or those contemplated and intended by Section 7 of this Settlement Agreement."[7] Id.

The Settlement Agreement includes as section 29 the following provision:

[t]he parties agree that the above is the full and complete agreement between the parties. The parties recognize that they have not agreed on how the above agreement impacts on the manner of terminating the [Russian Enforcement Proceeding], pending before the Russian Bailiff Service, or the fees imposed by the Russian Bailiff Service. The parties agree, however, that the impact of this manner of termination and of these fees is not a material term of the above agreement, that the above agreement is enforceable notwithstanding the dispute regarding the manner of termination and the fees imposed by the Russian Bailiff Service, and that either party may seek to resolve these issues by appropriate means, including an application to the Court in Chigirinskiy v. Panchenkova, 14 Civ. 4410 (S.D.N.Y.) (JPO) (GWG) to enforce the above agreement. Any application to resolve the disagreement over the manner of termination of the proceeding pending before the Russian Bailiff Service or the fees imposed by the Russian Bailiff Service shall be resolved by examining the intent of the parties as expressed in the above agreement.

Id. § 29.

C. Dismissal of the Case and the Instant Motions

After signing the Settlement Agreement, the parties filed a stipulation of dismissal with prejudice in this action, which the Court "so ordered" on January 23, 2018. See Stipulation of Dismissal with Prejudice, filed Jan. 23, 2018 (Docket # 291). This stipulation provided that "[t]his Court shall retain jurisdiction to enforce the Settlement Agreement . . . and to resolve any

---

[7] Section 7 in the executed Settlement Agreement reads "[t]his Section has been intentionally left blank." Settlement Agreement § 7. In a previously proposed but unexecuted version of the Settlement Agreement, section 7 stated that Panchenkova would pay the Bailiff's Fee on Chigirinskiy's behalf, and Chigirinskiy would in turn convey his half shares in the three St. Petersburg apartments to her. See Draft Settlement Agreement, dated Dec. 12, 2017 (annexed as Ex. A to Letter from George Benaur, dated Dec. 20, 2017 (annexed as Ex. 4 to Eilender Decl.)), § 7.

disputes arising from or relating to [it]." Id. ¶ 4.  Around the same time, Panchenkova's counsel advised the Court that the parties intended to resolve the remaining issues mentioned in section 29 by a motion to enforce the Settlement Agreement, for which the parties had agreed to a briefing schedule.  See Letter from Jeffrey M. Eilender, filed Jan. 22, 2018 (Docket # 290).

This letter also referred to the parties' desire to file the Settlement Agreement and related papers in redacted form.  Id.  In response, the Court warned that although the parties were not obligated to publicly file the Settlement Agreement before filing the contemplated motion, that "calculus [would] dramatically change . . . in the event a motion to enforce the Settlement Agreement is filed, because any such motion would call upon the Court to make an adjudication based on the terms of the Settlement Agreement."  See Memorandum Endorsement of Letter from Jeffrey M. Eilender, filed Jan. 24, 2018 (Docket # 292).  The parties thereafter filed their motions, and Panchenkova sought to seal certain portions of the moving papers and underlying documents.

D.  The March 2018 Dispute About the Russian Enforcement Proceeding

After Panchenkova's motion was filed, the parties had a disagreement regarding a pending hearing in the Russian Enforcement Proceeding.  On March 7, 2018, Chigirinskiy's counsel wrote to the Court stating that a hearing in an enforcement proceeding in which Panchenkova sought to recover Chigirinskiy's half shares in the St. Petersburg apartments was scheduled for March 12, 2018.  See Letter from George Benaur, filed Mar. 7, 2018 (Docket # 301) ("Emergency Application Letter"), at 2.  The letter stated that although Panchenkova's Russian lawyer, Larisa Ryabchenko, originally proposed adjourning this hearing until the parties resolved how to terminate the Russian Enforcement Proceeding, Panchenkova's counsel in this action instead stated on March 1, 2018, that Panchenkova intended to "make an application to

the court bailiff to return the writs of execution [at the March 12, 2018 hearing], which will lead

to termination of the enforcement proceeding" unless Chigirinskiy agreed to a different dismissal

protocol that he was sent earlier by Panchenkova.  Id. at 2-3.[8]  The impetus of this demand was,

according to Panchenkova's counsel, Panchenkova's desire to comply with section 4 of the

Settlement Agreement's requirement that the Russian Enforcement Proceeding be terminated.

See id. at 3.  In a letter to this Court, Chigirinskiy's counsel stated that he would respond by

"fil[ing] a formal motion for a TRO" if need be, but that he simply sought to "hold the status quo

pending Your Honor's ruling under the section 29 procedure which you suggested and ordered."

Id. at 5.

> Panchenkova's counsel responded that he had proposed to Chigirinskiy's counsel that
>
> > unless and until there is either an agreement between the parties on the method of
> > termination, or Judge Gorenstein's decision on the motion, [Panchenkova] will not ask
> > the bailiff to return the writs of execution, and [Chigirinskiy] shall have no claim against
> > [Panchenkova] (for breach of the Settlement Agreement or otherwise) in connection with
> > her failure to take any affirmative steps to terminate the enforcement proceeding in
> > Russia.

Letter from Vitali S. Rosenfeld, dated Mar. 7, 2018 ("Rosenfeld Mar. 7 Letter"), at 2.[9]

Chigirinskiy's attorney responded that "[t]hese representations from [Panchenkova]'s counsel

are sufficient to resolve the immediate issue raised in my letter."  See Letter from George

---

[8]  While the protocol has purportedly been placed in the record, see Email and
Attachment from Vitali S. Rosenfeld to George Benaur and Alexander Povolotskiy, dated Feb.
23, 2018 (annexed as Ex. A to Emergency Application Letter), we cannot examine its contents as
it is in Russian.

[9]  Panchenkova's counsel also requested in this letter, without citation to case law, that
Chigirinskiy's counsel's earlier letter be removed from the docket because it referred to
confidential terms of the Settlement Agreement, and asked the Court to issue a warning to
Chigirinskiy's attorney regarding his violation of the confidentiality provision of that
Agreement.  See Rosenfeld Mar. 7 Letter at 3.

Benaur, filed Mar. 8, 2018 (Docket # 303) ("Benaur Mar. 8 Letter"), at 1.  The Court accordingly did not rule on these requests.

On March 12, 2018, the hearing in the Russian Enforcement Proceeding was adjourned.  See Ryabchenko Reply Decl. ¶ 28.  According to Chigirinskiy's Russian counsel, however, Panchenkova's Russian counsel sought to recover Chigirinskiy's half-interests in the three St. Petersburg apartments at this hearing prior to the adjournment.  See Povolotskiy Decl. ¶ 25.  Panchenkova's motion to recover this property was withdrawn at a subsequent hearing on April 3, 2018.  See Court Ruling, translation certificate dated Apr. 10, 2018 (annexed as Ex. 2 to Ryabchenko Reply Decl.), at 1.

II.  GOVERNING LAW

Although "[a] federal court does not automatically retain jurisdiction to hear a motion to enforce or otherwise apply a settlement in a case that it has previously dismissed," In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 134 (2d Cir. 2011) (citation omitted), a federal court may retain jurisdiction to enforce such agreements where, as here, "the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal — either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994).  Upon retaining such jurisdiction, "[a] district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it."  Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974) (per curiam) (citations omitted); accord Milner v. City of New York, 2012 WL 3138110, at *3 (S.D.N.Y. Aug. 2, 2012).

"Settlement agreements are contracts and must therefore be construed according to

10

general principles of contract law." Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004) (internal quotation marks omitted) (quoting Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999)); accord Bluelink Mktg. LLC v. Carney, 2017 WL 4083602, at *5 (S.D.N.Y. Sept. 15, 2017). Here, the Settlement Agreement states that it is "governed by New York Law." Settlement Agreement § 19. Moreover, the parties' briefs assume that New York law applies. See Def. Mem. at 6; Pl. Mem. at 14. Thus, we will apply New York law. See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'") (alteration in original) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

"Under New York law, written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'" Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 436 (2013) (alteration in original) (quoting Greenfield v. Phillies Records, 98 N.Y.2d 562, 569 (2002)). Accordingly, "when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp., 4 N.Y.3d 272, 277 (2005) (alteration in original) (internal quotation marks and citations omitted). Conversely, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990) (citations omitted).

However, where a court finds that a written contract is ambiguous, extrinsic evidence may be considered to interpret that agreement. See Greenfield, 98 N.Y.2d at 569 ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous . . . .").

Whether a contract is ambiguous, such that extrinsic evidence may be considered in interpreting that contract, is "an issue of law for the courts to decide." Marin v. Constitution Realty, LLC, 28 N.Y.3d 666, 673 (2017) (internal quotation marks omitted) (quoting Greenfield, 98 N.Y.2d at 569). A court must make this determination by looking only "within the four corners of the document." Brad H. v. City of New York, 17 N.Y.3d 180, 186 (2011). In other words, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." S. Rd. Assocs., LLC, 4 N.Y.3d at 278 (quoting W.W.W. Assocs., 77 N.Y.2d at 163). Rather, "[a]mbiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation." Brad H., 17 N.Y.3d at 186 (citations omitted). Finally, ambiguity must be determined by examining the contract as a whole. See Burlington Ins. Co. v. N.Y.C. Transit Auth., 29 N.Y.3d 313, 331 (2017) ("Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or where its terms are subject to more than one reasonable interpretation.") (alteration, internal quotation marks and citation omitted).

## III. DISCUSSION

In moving to enforce the Settlement Agreement, Chigirinskiy seeks an order stating that Panchenkova must "terminate the proceedings in Russia with prejudice as agreed by the Parties in their Settlement Agreement and . . . [that Panchenkova must] pay the Bailiff's Fees and . . . compensate [Chigirinskiy] for the fees and costs associated with this Motion." Pl. Mem. at 22 (emphasis in original). Panchenkova seeks a declaratory judgment from this Court stating that pursuant to the Settlement Agreement, she "does not owe any payment to [Chigirinskiy] or on his behalf in connection with any proceedings in Russia." Def. Mem. at 16. Panchenkova also argues that Chigirinskiy "should bear the costs of this motion, including attorneys' fees" because

"this entire motion practice was necessitated by nothing but [his] baseless and unreasonable insistence that [Panchenkova] should pay the Russian Bailiff Fees instead of him." See Def. Reply at 18 n.9.

We next examine (1) whether either party is obligated to pay the Bailiff's Fee under the Settlement Agreement; (2) the manner of dismissal of the Russian Enforcement Proceeding required by the Settlement Agreement; and (3) whether either party owes the other costs or attorneys' fees incurred in bringing this motion.[10]

A.  The Bailiff's Fee

Each party claims that the other is required, pursuant to the Settlement Agreement, to pay the Bailiff's Fee arising from the Russian Enforcement Proceeding.  See Def. Mem. at 9-11; Pl. Mem. at 19-20.

As an initial matter, we reject Panchenkova's argument, Def. Mem. at 5-9, that the issue of which party owes the Bailiff's Fee is outside of the scope of the Agreement.  Section 29 states "[a]ny application to resolve the disagreement over the manner of termination of the proceeding pending before the Russian Bailiff Service or the fees imposed by the Russian Bailiff Service shall be resolved by examining the intent of the parties as expressed in the above agreement." Settlement Agreement § 29.  This provision establishes that the issue of liability for the Bailiff's Fee is governed by the terms of the Agreement.  This section even provides a mechanism for resolving a dispute over which party owes the Bailiff's Fee — that is, by dictating that "either

_____

[10]  Chigirinskiy has requested this Court schedule an evidentiary hearing to resolve factual and legal issues relating to this motion.  See Letter from George Benaur, dated Mar. 19, 2018 (Docket # 310); Letter from George Benaur, dated Apr. 17, 2018 (Docket # 314), at 3; Pl. Supp. Mem. at 1.  There is no need to have a hearing to resolve any legal issue as such issues were required to be presented in the parties' briefs.  As to factual issues, we find that there is no material issue of fact requiring resolution.  Thus an evidentiary hearing is unnecessary.

party may seek to resolve these issues by appropriate means, including an application to the Court in <u>Chigirinskiy v. Panchenkova</u>, 14 Civ. 4410 (S.D.N.Y.) (JPO) (GWG) to enforce the above agreement." <u>Id.</u> In light of this provision, the issue of which party owes the Bailiff's Fee is plainly within the scope of the Settlement Agreement.

Panchenkova points to the portion of section 29 of the Settlement Agreement providing that the parties "'recognize that they have not agreed . . . on the manner of terminating the . . . Enforcement Proceeding . . . pending before the Russian Bailiff Service, or the fees imposed by the Russian Bailiff Service' — and expressly agreed 'that the impact of this manner of termination and of these fees is not a material term of the above agreement.'" Def. Mem. at 8 (quoting Settlement Agreement § 29). Contrary to Panchenkova's argument, however, this provision does not suggest that the Russian Enforcement Proceeding issues are outside the scope of the Settlement Agreement. Rather, it reflects only that the parties agree it is not a "material term." Section 29's acknowledgment that the allocation of the Bailiff's Fee is not a "material" term of the agreement operates to ensure that the Settlement Agreement is enforceable notwithstanding the failure to designate which party must bear the Fee. <u>Cf.</u> <u>Ciaramella v. Reader's Digest Ass'n, Inc.</u>, 131 F.3d 320, 325 (2d Cir. 1997) (settlement agreement may not be binding where the parties fail to agree to "all material terms."). In sum, far from suggesting that the Russian Enforcement Proceeding issues are outside the agreement, section 29 makes clear that these issues were actually governed by the Settlement Agreement.

Turning to the question of whether Panchenkova is obligated to pay the Bailiff's Fee, section 4 of the Agreement states "each of the Parties [shall] bear its own costs and attorneys' fees" arising from the Russian Enforcement Proceeding. Both parties seem to assume that this statement controls which party must pay the Fee. Chigirinskiy argues that because Panchenkova

14

initiated this action, she should pay the Bailiff's Fee because this Fee should be considered "an extension of the legal fees incurred by [Panchenkova]." Pl. Mem. at 6. Panchenkova argues that, pursuant to this section, "the Parties walk away from their claims, they do not pay or owe anything to each other, and each of the parties will deal with its own costs, fees, and other third party charges," including the Bailiff's Fee. Def. Mem. at 7. Neither party, however, attempts to explain what is meant by the phrase "costs and attorneys' fees," which is not defined in the Settlement Agreement. Thus, it is not clear whether the Bailiff's Fee can be considered "costs and attorneys' fees" under the Agreement.

Other than section 4, only the release provisions concern the parties' obligations for liabilities arising from their prior litigation. Section 8 contains Chigirinskiy's release. It states that

> [e]xcept for the representations made and obligations arising under this Settlement Agreement and any claims or obligations arising from, relating to or at issue in the [Connecticut Case], [Chigirinskiy] hereby releases . . . any and all damages, debts, judgments, claims, complaints, suits, or causes of action, known or unknown, against [Panchenkova] . . . that . . . [Chigirinskiy] ever had, now have, or hereafter can, shall or may have . . . . from the beginning of the world to the day of execution of this Settlement Agreement.

Settlement Agreement § 8. In other words, pursuant to this section, Chigirinskiy released all claims that he had against Panchenkova except for those claims arising from the Connecticut Case or enforcement of the Settlement Agreement.

The parties have not suggested that any other provisions may be relevant to the question of which party is obligated by the Settlement Agreement to bear the Bailiff's Fee; nor has the Court's review of the Settlement Agreement revealed any other relevant provisions.

We conclude that, when read together, sections 4 and 8 reflect that Panchenkova is not obligated under the terms of the Settlement Agreement to pay any part of the Bailiff's Fee.

15

These provisions relieve the parties of any financial obligations to each other from then-existing litigation, including this case, except for narrow carve-outs relating to the Connecticut Case and enforcement of this Agreement, which are not at issue in this motion. The parties do not dispute that under Russian law, the Bailiff's Fee is the obligation of the debtor — here, Chigirinskiy. Indeed, the parties' Russian law experts agree that the Bailiff's Fee is currently Chigirinskiy's obligation to the Russian Federation, though one calls it a "monetary penalty" and the other calls it a "sanction." Ryabchenko Decl. ¶ 8; Rachkov Decl. ¶¶ 20-21. Notably, a recital in the Settlement Agreement itself refers to the Bailiff's Fee as Chigirinskiy's "current indebtedness to the Russian Bailiff Service." See Settlement Agreement at 3. If, as the parties assume, this Fee constitutes "costs" or "attorneys' fees" within the meaning of section 4 of the Agreement, the combination of that section with the recital makes clear that the obligation to pay the fee is Chigirinskiy's, not Panchenkova's. We thus reject Chigirinskiy's argument that the Bailiff's Fee should in fact be considered Panchenkova's "legal fees" under the Settlement Agreement because she "started the proceedings." Pl. Mem. at 6. This argument is completely unconnected to any provision of the Settlement Agreement and is at odds with the ordinary meaning of the term "legal fees."

Even if the Bailiff's Fee is not a "cost or attorneys' fee" within the meaning of section 4, the same result ensues. Under section 8 of the Agreement, Chigirinskiy released any claim against Panchenkova regarding any obligation that arose prior to the signing of the Settlement Agreement. It is undisputed that the obligation had already arisen at the time the Settlement Agreement was signed because it is specifically referenced in the Settlement Agreement. See Settlement Agreement at 3. And the obligation, of course, is not one that Chigirinskiy owes to Panchenkova — which would have been extinguished by Panchenkova's release in section 10 —

but rather an obligation he owes to the Russian Federation, a nonparty to the Agreement.

Chigirinskiy counters that "[g]iven the 'walk-away' nature of the agreed settlement, where [Chigirinskiy] was to have 'no financial obligations,' it is clearly right to treat the Bailiff's fees as deriving from [Panchenkova's] claims." Def. Mem. at 6.[11] But the question of who should bear fees "derive[d] from" a party's claims is not addressed in the Settlement Agreement. Rather, the Settlement Agreement addresses only costs and fees that are actually in existence at the time of the Settlement Agreement without reference to how they came into being. Additionally, the phrase "no financial obligations" is not contained in the Settlement Agreement, notwithstanding the fact that Chigirinskiy puts the phrase in quotation marks. Rather, the phrase comes from a statement his counsel made in an email to Panchenkova's counsel, see Email Exchange Between Jeffrey M. Eilender and George Benaur, dated Sept. 15, 2017, and Nov. 15, 2017 (annexed as Ex. 1 to Eilender Decl.), which we are not permitted to consider given the clear and unambiguous terms of the Settlement Agreement. In any event, it is a misquotation inasmuch as the email from Chigirinskiy's counsel stated, in a separate sentence, "[n]o financial conditions" (not "obligations"). Id. (emphasis added). Chigirinskiy's counsel also fails to explain why a settlement agreement imposing "no financial conditions" or "obligations" should be read to absolve Chigirinskiy of his financial obligation to a nonparty (that is, the Russian Federation), let alone why it should be read to impose an obligation on Panchenkova.

Chigirinskiy argues that Panchenkova should pay the Bailiff's Fee "as a result of her abuse of process and deceitful conduct." Pl. Mem. at 19-20. Chigirinskiy also argues that

---

[11] Although the parties continually refer to the Settlement Agreement as a "walk away" agreement in their briefing, they do so by referencing emails exchanged in negotiating the Agreement. See, e.g., Def. Mem. at 3; Pl. Mem. at 2. Because we find the terms of the Settlement Agreement to be unambiguous, we do not consider these emails.

Panchenkova should pay the Bailiff's Fee because his "name should be cleared in Russia." Id. at 6. Chigirinskiy fails to show how either of these arguments relate to any term of the Settlement Agreement, or indeed, any legal doctrine whatsoever. We thus reject them.

Lastly, Chigirinskiy asserts that, as contended by his Russian legal expert, the Bailiff's Fee "can . . . be paid by a third party[.]" See Pl. Mem. at 19 (citing Rachkov Decl. ¶¶ 23-29). However, this statement supports only the proposition that, as Chigirinskiy's expert later puts it, "the imposition of the Bailiff's fee on the debtor does not preclude payment of the fee by a third party." Rachkov Decl. ¶ 23 (emphasis added). The question at issue, however, is not whether Panchenkova "can" pay the Bailiff's Fee under Russian law, but rather whether the Settlement Agreement requires her to do so. For the reasons we have already stated, the Settlement Agreement does not so require her.

At its essence, Chigirinskiy's position rests on his view that he "should not have any remaining financial obligations under this settlement." Pl. Mem. at 6. The flaw in Chigirinskiy's argument, however, is that the Settlement Agreement provides only that he will "not have any remaining financial obligations" to Panchenkova. It does not address the question of whether he will have financial obligations to others, including financial obligations — such as the Bailiff's Fee — that were created by Panchenkova's actions. Because the Settlement Agreement contains no provision requiring Panchenkova to bear this Fee, Chigirinskiy's request for an Order requiring Panchenkova to do so is denied.

B. Dismissal With or Without Prejudice

Chigirinskiy argues that the Settlement Agreement requires Panchenkova to dismiss the Russian Enforcement Proceeding with prejudice and that to do so she would have to use one of the methods proposed by his Russian legal expert: that is, (1) waiving the right to collect the debt

from Chigirinskiy; or (2) obtaining the Russian court's approval of a settlement or conciliation agreement.  See Pl. Mem. at 10-11 (citing Rachkov Decl. ¶ 46).  Panchenkova does not address this argument directly but instead asserts that "the only way [Chigirinskiy] may avoid paying the Bailiff Fees under Russian law is to agree to have the Enforcement Proceeding terminated" in a manner that would result in dismissal of the Russian Enforcement Proceeding without prejudice.  See Def. Reply at 9, 19.  This method, according to Panchenkova's Russian legal expert, would require Chigirinskiy to convey to Panchenkova his one-half interest in the three St. Petersburg apartments in partial execution of the debt Chigirinskiy owes her.  See Def. Reply at 8.  The bailiff would then terminate the Enforcement Proceeding without initiating a separate proceeding to collect the Bailiff's Fee because Chigirinskiy would have no assets in Russia from which the bailiff could collect the Fee.  See id. (citing Ryabchenko Decl. ¶¶ 31-34).

We need not dwell on this dispute because the Settlement Agreement unambiguously requires dismissal of the Russian Enforcement Proceeding "with prejudice."  Settlement Agreement § 4.  Indeed, Panchenkova does not dispute that pursuant to this provision she must terminate the Russian Enforcement Proceeding with prejudice.  Instead, she argues that dismissal without prejudice would be in the parties' best interests because it would permit the parties to avoid the imposition of the Bailiff's Fee.  See Def. Mem. at 13-16.  That consideration is unconnected to the terms of the Settlement Agreement, however, and thus we leave it to the parties to determine whether they would prefer to stipulate to amend the Settlement Agreement to allow for a dismissal without prejudice.  As to which method of dismissal with prejudice should be used, Chigirinskiy has not asked this Court to issue an order requiring that Panchenkova use a particular method.  Thus, we do not address this issue.

We note that Panchenkova objects that the methods of dismissal proposed by

Chigirinskiy's expert "are very problematic to implement, and also fail to comply with Section 4 of the Settlement Agreement, because neither of these methods can possibly procure termination of the Enforcement Proceedings within 45 business days as Section 4 requires." Def. Mem. at 11 (citing Ryabchenko Reply Decl. ¶¶ 12-19); <u>see also</u> Def. Supp. Mem. at 3-7. Panchenkova, however, admits that dismissal of the Russian Enforcement Proceeding with prejudice within 45 days is possible, albeit by a method different than the ones proposed by Chigirinskiy's expert. <u>See</u> Def. Supp. Mem. at 7-8. Again, it is not necessary to resolve this dispute because no party has asked us to determine which method of dismissal with prejudice is required by the Settlement Agreement. However, we do note that one of Panchenkova's objections to Chigirinskiy's proposed methods is unfounded because it misreads the Settlement Agreement. The Settlement Agreement does not require the parties to achieve dismissal with prejudice within 45 business days as Panchenkova argues. Rather, it requires that, within 45 business days, the parties "execute and exchange . . . any documents sufficient and necessary" to effectuate such dismissal. Settlement Agreement § 4. In other words, it is the execution and exchange of documents, rather than the dismissal with prejudice, that must occur within 45 business days of the Settlement Agreement's execution. Inasmuch as Rachkov's proposed methods of dismissal are otherwise "problematic," Def. Reply at 11, Panchenkova fails to explain how such issues would relieve any party of its obligation to exchange such documents as required by the Settlement Agreement.

In sum, the Court grants Chigirinskiy's motion seeking a declaration that the Settlement Agreement requires dismissal with prejudice.

C. <u>Breach and Fees</u>

Both parties seek to recover their fees, costs, and expenses arising from the instant

motion pursuant to section 25 of the Settlement Agreement.  Section 25 of the Settlement

Agreement provides that

> [i]n addition to and without prejudice to any other remedies, each Party shall also be
> entitled to the breaching Party's payment of reasonable attorneys' fees and costs and
> expenses (including fees upon fees) it incurs: (i) arising from any breach of this
> Settlement Agreement by such breaching Party; or (ii) as the prevailing party in any
> action or proceeding arising from, relating to or in connection with this Settlement
> Agreement.

As this section makes clear, fees, costs, and expenses can be recovered only from a

"breaching Party."

### 1. Chigirinskiy's Request

Chigirinskiy claims that Panchenkova breached the Settlement Agreement by (i) failing

to agree to dismiss the Russian Enforcement Proceeding with prejudice, in violation of sections 4

and 11 of the Agreement, Pl. Mem. at 16; (ii) threatening to dismiss the Russian Enforcement

Proceeding by withdrawing Panchenkova's writs of execution prior to this Court's ruling on the

instant motion, which Chigirinskiy also argues constitutes contempt of court, id. at 17; (iii)

hiding the Settlement Agreement from the Russian court presiding over the Enforcement

Proceeding on March 12, 2018, id. at 5; and (iv) attempting to recover Chigirinskiy's half-

ownership of the St. Petersburg apartments during that hearing, id. at 5, 16.  We reject each of

these claims.

First, Panchenkova has not breached the contract by failing to dismiss the Russian

Enforcement Proceeding with prejudice within 45 days of the Settlement Agreement's

execution.  This is because section 4 imposes an obligation on "the Parties," not just

Panchenkova, to execute and exchange documents within 45 days of the Agreement's execution

that are sufficient to effect dismissal with prejudice.  Whatever actions Panchenkova was

required to take to fulfill her obligation, in her letter to the Court dated March 7, 2018, Panchenkova offered that "unless and until there is either an agreement between the parties on the method of termination, or Judge Gorenstein's decision on the motion, [Panchenkova] will not ask the bailiff to return the writs of execution, and [Chigirinskiy] shall have no claim against [Panchenkova] (for breach of the Settlement Agreement or otherwise) in connection with her failure to take any affirmative steps to terminate the enforcement proceeding in Russia." Rosenfeld Mar. 7 Letter at 2. Chigirinskiy responded that "[t]hese representations from [Panchenkova]'s counsel are sufficient to resolve the immediate issue raised in my letter." Benaur Mar. 8 Letter at 1. As pointed out by Panchenkova, she detrimentally relied on this assurance by abandoning any attempt to comply with her interpretation of section 4 by dismissing the Russian Enforcement Proceeding within 45 days. See Def. Reply at 15-16. No finding of breach is appropriate because Chigirinskiy is estopped from claiming that Panchenkova is responsible for the failure to take any action during this period. As the New York Court of Appeals has held, estoppel is appropriate "in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." Nassau Tr. Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 184 (1982). Panchenkova was justified in relying on Chigirinskiy's acquiescence to the arrangement outlined in the March 7 Letter, and thus the obligation to comply with the 45-day deadline cannot be enforced by Chigirinskiy.

Second, Panchenkova's "threat" to dismiss the proceeding without prejudice does not constitute a breach of section 4 of the Settlement Agreement requiring dismissal with prejudice.

Panchenkova never actually carried out that threat. Nor has Chigirinskiy argued — let alone shown — that this "threat" was sufficiently definite to constitute an anticipatory repudiation. Rachmani Corp. v. 9 E. 96th St. Apartment Corp., 211 A.D.2d 262, 267 (1st Dep't 1995) ("[T]here must be a definite and final communication of the intention to forego [sic] performance before the anticipated breach may be the subject of legal action."). Indeed, the parties resolved this dispute without court intervention, as described above. Moreover, because this threat did not violate a Court order, it cannot form a basis on which to find Panchenkova in contempt of court.

Third, Chigirinskiy claims that Panchenkova breached the Settlement Agreement by "hid[ing]" the Settlement Agreement from the Russian Enforcement Proceeding court "even as late as the last hearing there held on March 12, 2018." Pl. Mem. at 5. Chigirinskiy does not identify a provision of the Settlement Agreement that was breached by Panchenkova's actions, however. Thus, this claim of breach is rejected.

Finally, we reject Chigirinskiy's assertion that Panchenkova breached the agreement because she "tried to take" Chigirinskiy's half-shares in the St. Petersburg apartments during a hearing in the Russian Enforcement Proceeding on March 12, 2018. Id. at 5, 16. Chigirinskiy argues, Pl. Mem. at 16, that this action breached section 4 of the Settlement Agreement, requiring Panchenkova to "withdraw[] any and all claims, motions, subpoenas, liens, costs, fees, and any other legal process pertaining to" the Russian Enforcement Proceeding, and section 11, which requires Panchenkova "not to . . . maintain any legal action or proceeding in any jurisdiction against" Chigirinskiy. However, Panchenkova's counsel later withdrew this motion at a hearing held April 3, 2018, see Court Ruling, translation certificate dated Apr. 10, 2018 (annexed as Ex. 2 to Ryabchenko Reply Decl.), at 1, an action that Chigirinskiy's counsel in this

action acknowledged was done "in compliance with the requirements of Section 4 of the Settlement Agreement," Email from George Benaur to Vitali Rosenfeld, dated Apr. 5, 2018 (annexed as Ex. 3 to Ryabchenko Reply Decl.). Accordingly, whatever action occurred on March 12, 2018, achieved no legal effect and we thus do not deem it to constitute a breach of the Settlement Agreement.

### 2. Panchenkova's Request

In attempting to collect the costs and fees incurred in making this motion, Panchenkova argues that because "this entire motion practice was necessitated by nothing but [Chigirinskiy's] baseless and unreasonable insistence that [Panchenkova] should pay the Russian Bailiff Fees instead of him," Chigirinskiy should be required to pay Panchenkova's costs and attorneys' fees. Def. Reply at 18 n.9. But Panchenkova fails to allege — let alone demonstrate — that Chigirinskiy's refusal to pay the Bailiff's Fee constitutes a breach of the Settlement Agreement. Thus, we can find no breach on this basis, and Chigirinskiy is not obligated to pay Panchenkova's costs and fees incurred in bringing this motion.

In sum, because neither side is a "breaching Party," neither side owes costs or attorneys' fees incurred in bringing these cross-motions to the other side pursuant to section 25 of the Settlement Agreement.

## IV. MOTION TO SEAL

Panchenkova moves to seal portions of the parties' briefs that reference the Settlement Agreement, as well as sections of the Settlement Agreement itself. See Def. Seal. Not.; Def. Seal Mem. In an undocketed letter, Panchenkova also requested that one of Chigirinskiy's earlier letters be removed from the docket because it referred to confidential matters contained in the Settlement Agreement. See Rosenfeld Mar. 7 Letter at 3. Chigirinskiy does not entirely

oppose Panchenkova's motion to seal, but counters that Panchenkova's request is "overbroad" and also asks this Court to issue an order allowing Chigirinskiy to reveal this Settlement Agreement to the Russian court presiding over the Enforcement Proceeding. See Pl. Seal Mem. at *3-5.

"There is a long-established 'general presumption in favor of public access to judicial documents.'" Bernsten v. O'Reilly, 2018 WL 1615840, at *1 (S.D.N.Y. Apr. 3, 2018) (quoting Collado v. City of New York, 193 F. Supp. 3d 286, 288 (S.D.N.Y. 2016)). "The presumption of access is based on the need for federal courts, although independent — indeed, particularly because they are independent — to have a measure of accountability and for the public to have confidence in the administration of justice." United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995). Judicial documents are documents "relevant to the performance of the judicial function and useful in the judicial process." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks and citation omitted). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action . . . ." DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 826 (2d Cir. 1997) (citing Amodeo, 71 F.3d at 1047). "Federal courts employ two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." Newsday LLC v. County of Nassau, 730 F.3d 156, 163 (2d Cir. 2013). We will first examine the common law right before briefly turning to the First Amendment right.

A.  Common Law Right of Public Access

The framework for determining whether a motion to seal a judicial document should be granted notwithstanding the common law presumption of public access is set forth in Lugosch, 435 F.3d 110.  Before the common law right of access attaches to any document, the Court must first determine whether such document is a "judicial document" to which this right attaches.  Id. at 119.  At step two of this analysis, the court must determine the weight of the presumption of access, which "must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." Id. (quoting Amodeo, 71 F.3d at 1049).  At the third and final step of the analysis, a court must then balance the weight of that presumption against "competing considerations," including "the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure."  Id. at 120 (internal quotation marks and citations omitted).

At step one, there is no question that the Settlement Agreement and the parties' briefs are judicial documents, and that the public is thus presumptively entitled to see these documents. Judicial documents are documents "relevant to the performance of the judicial function and useful in the judicial process."  Id. at 119 (internal quotation marks and citation omitted).  Here, both the Settlement Agreement and the parties' briefs were filed in connection with the instant motion, and thus are relevant to the judicial function of adjudicating this motion.

At step two, we find this presumption is entitled to great weight.  A document that "comprise[s] a significant proportion of the . . . record before the Court and . . . pertain[s] to matters that directly affect the Court's adjudication" carries with it a heavy presumption of

public access.  Bernsten, 2018 WL 1615840, at *3 (second alteration in original) (internal

quotation marks omitted) (quoting Collado, 193 F. Supp. 3d at 289)).  Here, the Settlement

Agreement and the parties' briefs pertain to matters directly affecting this Court's adjudication

— indeed, the entirety of this motion concerns the interpretation of the Settlement Agreement,

and the parties' arguments regarding that motion are presented in the parties' briefs.


We reject Panchenkova's argument that "[i]t is . . . well-established that there is little

interest in public access to settlement documents."  Def. Seal Mem. at 6 (citation omitted).  In

support of this argument, Panchenkova cites United States v. Glens Falls Newspapers, Inc., 160

F.3d 853 (2d Cir. 1998), which held that "access to settlement discussions and documents has no

value to those monitoring the exercise of Article III judicial power by the federal courts."  Id. at

857.  Similarly, Panchenkova cites Gambale v. Deutsche Bank AG, 377 F.3d 133 (2d Cir. 2004),

which found a settlement agreement confidential notwithstanding the fact that it some of its

terms were disclosed on the record "in response to the court's apparently casual questioning of

counsel in the course of proceedings addressing the settlement, not the adjudication, of

litigation."  Id. at 143.

Neither of these cases provide guidance here, however, because in neither case was a

court was being asked — as is true here — to enforce a settlement agreement or to otherwise

adjudicate the effect of settlement terms.  Gambale itself noted that "the presumptive right to

public observation is at its apogee when asserted with respect to documents relating to matters

that directly affect an adjudication."  Id. at 140 (internal quotation marks and citation omitted).

Based on this consideration, a court in this Circuit recently found a "heavy" presumption of

public access to settlement, mutual release, and arbitration agreements submitted in connection

with a motion to dismiss and/or compel arbitration based on those agreements. Bernsten, 2018 WL 1615840, at *1, *3. The same consideration applies here and distinguishes the instant case from Gambale and Glens Falls Newspapers, Inc. A heavy presumption of public access is thus warranted.[12]

Panchenkova also asks the Court to "seal only certain portions of the motion papers relating to the confidential settlement terms that the Court does not need to adjudicate" on the basis that "knowledge of all the settlement terms [would not] assist the public in scrutinizing the Court's decision-making process." Def. Seal Mem. at 2. However, Lugosch rejected a similar argument, noting that a district court should not give "different types of documents . . . different weights of presumption based on the extent to which they were relied upon in resolving the motion." 435 F.3d at 123. For the same reason, we reject Panchenkova's argument that certain portions of the Settlement Agreement should be granted a lighter presumption of public access on the ground that we have not specifically cited them in resolving the instant motion.

Finally, at step three, we find that the parties do not possess a sufficient privacy interest in the materials contained in the Settlement Agreement and briefs to warrant their sealing — with a limited exception. "In determining the weight to be accorded an assertion of a right of privacy, courts should . . . consider the degree to which the subject matter is traditionally

---

[12] In a similar vein, we find irrelevant Panchenkova's citation to two cases, see Def. Seal Mem. at 6-7, in which settlement documents were sealed that were not the subject of any adjudication by a court. See Yunda v. SAFI-G, Inc., 2017 WL 1608898, at *4 n.2 (S.D.N.Y. Apr. 28, 2017) ("[T]he parties' FLSA settlement agreement will be filed with this Order; however, because the parties' NYLL agreement is confidential and is not subject to judicial review, it shall not be filed on the public docket."); Abrar v. 7-Eleven, Inc., 2016 WL 1465360, at *1 (E.D.N.Y. Apr. 14, 2016) (approving a "bifurcated settlement structure" under which the parties could "execute a separate settlement agreement of . . . the Plaintiff's non-FLSA claims, which would remain confidential and would not require the Court's approval.").

considered private rather than public." <u>Amodeo</u>, 71 F.3d at 1051. Matters that "weigh more heavily against access" include "family affairs, . . . embarrassing conduct with no public ramifications, and similar matters." <u>Id.</u> Panchenkova asserts that the parties have a privacy interest in "such inherently private matters as division of property between former spouses" and other matters relating to the parties' personal lives. Def. Seal Mem. at 5.

We accept that the privacy of one particular matter — specifically what we have referred to as the "Connecticut Case" — should be given great weight. The remaining matters covered by the Settlement Agreement, including the property dispute between the parties, might otherwise have seemed matters entitled to protection. That is not the case here, however, because significant information concerning the parties' interpersonal dispute was long ago disclosed in Chigirinskiy's unsealed complaint, including the second amended complaint, <u>see generally</u> SAC (discussing division of marital property), and Panchenkova's unsealed answer to that complaint, <u>see</u> Am. Answer at Counterclaims ¶ 9 (discussing money judgment awarded by Russian Divorce Decree). As the Second Circuit has noted, the Court has no ability to make private that which has already become public. <u>See</u> <u>Gambale</u>, 377 F.3d at 144 (Once "[t]he genie is out of the bottle," a court does "not [have] the means to put the genie back."); <u>accord</u> <u>JetBlue Airways Corp. v. Helferich Patent Licensing, LLC</u>, 960 F. Supp. 2d 383, 397 (E.D.N.Y. 2013) ("Any countervailing privacy interest of [the party seeking sealing] cannot defeat the strong presumption of public disclosure where the material it seeks to seal is already in the public domain."); <u>Gucci Am., Inc. v. Guess?, Inc.</u>, 2010 WL 1416896, at *1 (S.D.N.Y. Apr. 8, 2010) (noting that a party's motion to seal came "too late" where the motion papers to be sealed had already been publicly filed and subject to articles published in the press).

Certainly, many portions of the Settlement Agreement — specifically, the parties' mutual

releases, covenants not to sue, and other implementing provisions — were not contained in the parties' pleadings. However, Panchenkova's sole argument in favor of sealing these provisions is that she "has been the subject of false, misleading and biased articles in the Russian press speculating about her assets and her disputes with [Chigirinskiy]," and that she accordingly "has a serious interest in protecting herself and her children from such baseless attacks in the future." Def. Seal Mem. at 5. There is no explanation, however, of why knowledge of these provisions will have any material effect on her privacy interests given that they represent minor details in a dispute that was otherwise made public in the pleadings.

Relying on the Settlement Agreement's confidentiality provision found in section 12, Panchenkova asserts that "the fact that the Agreement specifically provides for confidentiality is significant." See id. at 6 (citing Gambale, 377 F.3d at 144). Such a confidentiality provision, however, cannot in and of itself be sufficient to overcome the presumption of public access. If it were otherwise, the presumption of public access would become "virtually meaningless," as it could be overcome any time the parties agreed to confidentiality. Wolinsky v. Scholastic Inc., 900 F. Supp. 2d 332, 338 (S.D.N.Y. 2012). Indeed, "[c]ourts in this District have long held that bargained-for confidentiality does not overcome the presumption." Bernsten, 2018 WL 1615840, at *4 (collecting cases).

Although Gambale, 377 F.3d 133, as noted by Panchenkova, found a settlement agreement deserved sealing in part due to a confidentiality agreement it contained, id. at 143, that case is inapposite because it found that the presumption of public access was weak due to the fact that terms of the settlement "made its way into the [a court proceeding] only in response to the court's apparently casual questioning of counsel in the course of proceedings addressing the settlement, not the adjudication, of litigation," id. The presumption of public access here, by

contrast, is extremely strong for the reasons just stated. It thus may not be overcome solely by the parties' mutually expressed desire to have the settlement terms kept private.[13]

In sum, when balanced against the great weight to be accorded judicial documents, we reject the parties' efforts to seal the filings in this case. The only exception will be the references to the court proceeding we have referred to as the "Connecticut Case" (as distinguished from the "Connecticut Enforcement Action" referenced in the Settlement Agreement) and the detailed description of the parties' Divorce Decree. These matters are referred to or contained in the following provisions of the Settlement Agreement: (1) the second recital paragraph, (2) the ninth recital paragraph, (3) section 5, and (4) scattered references in sections 4, 8, 9, 10 and 11 to the Connecticut Case. We permit the sealing of these portions of the Settlement Agreement because these portions involve nonparties with a strong privacy interest and have no bearing on the adjudication of the instant motions. Case law has held that "the privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation in determining what portions of motion papers in question should remain sealed or should be redacted." Matter of N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987).

B. First Amendment Right of Public Access

As noted, the First Amendment creates a stronger right of public access to judicial documents than does the common law. See Newsday LLC, 730 F.3d at 163. Pursuant to the

---

[13] Panchenkova asserts, Def. Sealing Mem. at 6-7, that in Kelly v. Evolution Mkts, Inc., 626 F. Supp. 2d 364 (S.D.N.Y. 2009), the court found "good cause" to keep an employment and compensation agreement confidential on the ground that it contained an express confidentiality provision. Id. at 377. However, this case contained no analysis of the right of public access to judicial documents, and did not cite to Lugosch and progeny. Indeed, this case did little more than cite the express confidentiality agreement in finding that sealing was appropriate. We thus do not find Kelly persuasive.

First Amendment right to access judicial records, "the public has a right to gain access to judicial records (1) that 'have historically been open to the press and general public,' and (2) where 'public access plays a significant positive role in the functioning of the particular process in question.'" In re N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials, 577 F.3d 401, 409 (2d Cir. 2009) (quoting Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 92 (2d Cir. 2004)). Nonetheless, "higher values" in the First Amendment framework may be balanced to restrict disclosure. Lugosch, 435 F.3d at 124.

We have already granted public access to the moving papers and the Settlement Agreement under the common law right of public access except as noted above, and thus do not consider whether the public also has a right to access these materials under the First Amendment. Insofar as we have found no common law right of public access to certain personal matters involving nonparties to the litigation, we conclude that "higher values" justify withholding this information notwithstanding the First Amendment right of public access, and the redactions are appropriate.

In sum, Panchenkova's motion to seal the Settlement Agreement and moving papers is denied, except that the Settlement Agreement may be filed with the following portions redacted: (1) the second recital paragraph, (2) the ninth recital paragraph, (3) section 5, and (4) scattered references in sections 4, 8, 9, 10 and 11 to the Connecticut Case. The parties shall also redact any reference to these paragraphs (or to the subjects of these paragraphs) in the motion papers. Panchenkova's request in her undocketed March 7 letter to have this Court remove Chigirinskiy's earlier filed letter is denied, as Chigirinskiy's letter refers to no part of the Settlement Agreement that will remain sealed. Panchenkova is directed to docket her March 7,

2018 letter to the Court for the same reason.[14]

V. CONCLUSION

For the reasons set forth above, Panchenkova's motion to enforce the Settlement

Agreement (Docket # 293) is granted, Chigirinskiy's cross-motion (Docket # 304) is granted in

part and denied in part, and Panchenkova's motion to seal (Docket # 297) is denied except to the

extent discussed above. Within 14 days of the date of this Opinion and Order, the parties shall

refile any motion paper or letter that previously contained redactions or did not otherwise

publicly appear on the docket in accordance with this Opinion and Order.

SO ORDERED

Dated: July 19, 2018
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[14] In his opposition to this motion, Chigirinskiy asked this Court to issue an order permitting the disclosure of the Settlement Agreement to the Russian court presiding over the Russian Enforcement Proceeding. See Pl. Seal Mem. at *5. We do not see why this request is within the Court's power to enforce the Settlement Agreement. In any event, the request is moot in light of the fact that the Settlement Agreement will be public, save for the limited exceptions we have ordered.

33